THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. TERRY STARNES, Defendant-Appellant.

First District (3rd Division)   No. 1—93—0477

Opinion filed June 28, 1995.

Pope & John, Ltd., of Chicago (Mary Kay Kelly, Kevin C. Clegg, and Robert F. Daley, of counsel), for appellant.

Jack O'Malley, State's Attorney, of Chicago (Renee Goldfarb, William John Healy, and Robert F. Hogan, Assistant State's Attorneys, of counsel), for the People.

JUSTICE CERDA delivered the opinion of the court:

Following a bench trial, defendant, Terry Starnes, was convicted of murder (Ill. Rev. Stat. 1989, ch. 38, par. 9—1(a)(3) (now 720 ILCS 5/9—1(a)(3) (West 1992))), three counts of attempted murder (Ill. Rev. Stat. 1989, ch. 38, pars. 8—4, 9—1(a) (now 720 ILCS 5/8—4, 9—1(a) (West 1992))), and armed robbery (Ill. Rev. Stat. 1989, ch. 38, par. 18—2(a) (now 720 ILCS 5/18—2(a) (West 1992))). He was sentenced to 60 years' imprisonment for murder, 30 years' imprisonment for attempted murder, and 30 years' imprisonment for armed robbery, all sentences to run concurrently.

On appeal, defendant asserts that (1) his confession was obtained involuntarily under *Edwards v. Arizona* (1981), 451 U.S. 477, 68 L. Ed. 2d 378, 101 S. Ct. 1880; (2) he was denied his sixth amendment right to effective assistance of counsel; and (3) the trial court abused its discretion in sentencing him to 60 years' imprisonment. For the reasons that follow, we affirm.

At trial, David K. Urban, who was a liquor store clerk at the PM Club, 2049 West Howard Street, Chicago, testified that the PM Club is a combination liquor store and tavern. On the evening of July 14, 1991, Urban was working in the liquor store and Ken Goll was the bartender in the tavern. Around 12:30 a.m., Urban went into the tavern and saw defendant sitting at the bar with another man. After Urban returned to the liquor store, defendant came into the store to use the public phone. He stayed on the phone for three or four minutes, then returned to the tavern. At that time, Urban and Goll were behind the store counter.

A few seconds later, Urban saw defendant standing next to the employee doorway. He was holding a large revolver and was motioning for Urban and Goll to come toward him, which they both did.

When Goll came to within one foot of defendant, defendant ordered him to the floor. Goll started to get on the floor, but defendant grabbed him by his shirt and began to strike him on the head with the gun. After Urban saw defendant strike Goll twice, he turned around and ran out of the liquor store. On his way out of the store, he heard two gunshots. Outside, Urban flagged down a Chicago police squad car.

Chicago police officer Joseph Serb testified that at 12:38 a.m. on July 15, 1991, he and his partner were driving on Howard Street when Urban flagged them down and told them that someone was robbing the PM Club. As the police officers got out of the car and moved toward the tavern, Serb heard four gunshots in rapid succession coming from inside the tavern. A man came out of the tavern door and collapsed 10 feet away. He had been shot in the back and was bleeding. By that time, several police officers were outside the tavern with their guns drawn.

A few minutes later, defendant came out of the tavern door. At that time, several police officers entered the tavern. Between the two doors leading into the tavern, Serb saw a large amount of cash on the floor. He later learned that there was $150 in cash. Inside the door, Michael Gordon was on the floor. He appeared to be dead. Serb also saw Salvadore Venzor, who had a gunshot wound to the head, lying on the ground. Partially underneath him was Stark Neville, who was not moving. When Serb went into the liquor store, Goll came from behind the coolers where he had been hiding. He was bleeding from head lacerations.

Chicago police officer Robert Kuczak testified that he and his partner were driving on Howard Street at 12:30 a.m. on July 15, 1991, when he saw Officer Serb get out of his car with his gun drawn. Kuczak stopped his car and approached Serb, who stated that he had heard shots. Kuczak drew his weapon and went to the tavern's front door while his partner helped Darnell Persons, who had a gunshot wound in his back.

Chicago police detective Robert Soreghan testified that he and his partner spoke with defendant at the police station at 4:35 a.m. on July 15, 1991. After being informed of his *Miranda* rights, defendant stated that he had been having a beer in the bar when he went to use the telephone. After completing the call, a man entered the bar with a gun and approached him. The man pushed defendant into the bartender, hit the bartender over the head with the gun, and started shooting. Defendant stated that he ducked and waited until the man left the bar.

Soreghan testified that the following conversation occurred:

"I then informed Mr. Starnes that he had been identified by a witness at the scene, and Mr. Starnes said that he would tell us the truth. *** Mr. Starnes said that he would tell us about what happened, but he wanted to have a lawyer present with him. *** I said that was fine, that we would stop questioning until—if he wanted an attorney present with him, that we would stop questioning. *** Well, at that time, Mr. Starnes said that he wanted to tell us what happened and how it happened and why. And I told him, that we were going to suspend questioning until an attorney could be appointed. *** Mr. Starnes then asked how long that would be, and I told him that it would—an attorney would be appointed to represent him in court. And he said, well—he asked if he could tell us the truth so that he could get his side of the story in and tell us why and what happened. I again told him that we would not question him any further if he still wanted an attorney present with him, and at that time, Mr. Starnes says, well, I want to tell you what happened and explain my side of it, and I'll do it without an attorney. I then said, are you sure you want to talk to us without an attorney present, and he said, yes."

Soreghan then spoke with defendant for 45 minutes before calling the assistant State's Attorney. At 5:30 a.m., Assistant State's Attorney Nick Ford arrived. After he interviewed the victims and witnesses who were at the police station, he interviewed defendant and then called a court reporter. At 7:25 a.m., defendant gave a court-reported statement. Later that morning, Ford brought the typewritten statement in to defendant, who read a couple of lines. Ford then read the statement to defendant, who corrected some errors in the statement before signing it.

There were stipulations that Michael Gordon died from multiple gunshot wounds, Kenneth Goll had a blunt head injury and a scalp laceration, Darnell Persons had a single gunshot wound in his back, and Salvadore Venzor had a gunshot wound in his head, which caused a fracture and a subarachnoid hemorrhage.

The defense called no witnesses.

The trial court found defendant guilty of first degree murder committed during a felony, three counts of attempted murder, and armed robbery. After the trial court found defendant eligible for the death penalty, an aggravation/mitigation hearing was held.

Lieutenant Wendell Harris of the Murray County, Tennessee, sheriff's department testified that defendant was 15 years old when he was adjudicated a delinquent in the Tennessee juvenile court for cashing stolen checks and committing a murder.

Sergeant Fred Booni of the Franklin, Tennessee, police depart-

ment testified that defendant pleaded guilty to burglary four years later and was sentenced to four years' imprisonment. In the same incident, defendant was found guilty of robbery and sentenced to six years' imprisonment, both sentences to be served consecutively.

Mary Williams and Mary Frances Hodges, two of defendant's aunts, testified that defendant's twin brother died within two hours of birth; defendant's mother physically and mentally abused defendant and eventually abandoned him when he was three years old; defendant was raised by his maternal grandmother; and defendant did not know his father until he was 15 years old.

Margaret Starnes, defendant's stepmother, testified that she met defendant when he was 15 years old. She described defendant's family relationships and physical handicap from sickle cell anemia.

Mary Ann Misters, defendant's live-in girl friend, testified that she had six children when she and defendant started dating. Defendant was kind to her and her children, especially the boys. After Misters and defendant started living together, they had a child of their own. According to Misters, defendant is a wonderful father and helped with the baby. When they met, defendant was working, but by the time they started living together, he was on public aid.

There was a stipulation that Linda Wetzler, a neuropsychologist, would testify that she reviewed defendant's school records, prior school testing, psychological testing, and special education records. Her report stated that defendant has a low average intellectual ability; a low average memory; severely impaired reading, spelling, and math skills due to a developmental cognitive disorder; severely impaired visual perception most likely related to his sickle cell anemia; past and recent auditory hallucinations indicating an organized psychosis; and current severe clinical depression.

After reviewing the facts of the case, the trial court found that defendant's criminal record demonstrated an inability to conform his conduct to the law. The trial court indicated that the audio tape recording of defendant's statement to police in the juvenile murder case showed a "cold-blooded outlook on things." In mitigation, the trial court considered defendant's early life experiences, sickle cell anemia, low average intellect, mental capacities, skills, capabilities, and lack of disciplinary problems in jail.

The trial court found that there was sufficient mitigation to preclude imposing the death penalty. Instead, defendant was sentenced to 60 years' imprisonment on murder, 30 years' imprisonment for attempted murder, and 30 years' imprisonment for armed robbery, the sentences to run concurrently.

On appeal, defendant asserts that his confession was obtained in-

voluntarily because the police continued to interrogate him after he asked for an attorney. Even though there was no motion to suppress his confession and his attorney did not raise this issue at trial or in his motion for a new trial, defendant argues that this was plain error because it affected his substantial constitutional right to counsel.

There is no dispute that defendant did not raise this issue at trial or in his motion for a new trial. However, errors allegedly denying defendant's substantial constitutional rights may be considered by the reviewing courts even if the issue was not properly preserved for review. (*People v. Almo* (1985), 108 Ill. 2d 54, 66, 483 N.E.2d 203; *People v. Quick* (1992), 236 Ill. App. 3d 446, 454, 603 N.E.2d 53.) Since the right to counsel is a substantial constitutional right (*People v. Moman* (1990), 201 Ill. App. 3d 293, 309, 558 N.E.2d 1231; *People v. Visnack* (1985), 135 Ill. App. 3d 113, 118, 481 N.E.2d 744), we will consider this issue.

Defendant contends that his confession obtained after he invoked his right to counsel was involuntary as a matter of law and the State failed to meet its burden in establishing that he reinitiated the conversation in a manner evincing a willingness and desire to discuss the investigation or that he knowingly and intelligently waived his previous request for an attorney. Furthermore, defendant maintains that the relationship between his first statement and the statement made to Assistant State's Attorney Ford were so closely related in time and circumstances that the earlier coercion had not dissipated prior to Ford's interrogation. Defendant argues that Detective Soreghan's testimony, which was the only evidence presented on the waiver issue, does not overcome the presumption of inadmissibility that attached to any statement made after he requested counsel.

Once a suspect asks for an attorney during a custodial interrogation, the interrogation must cease and the suspect must not be approached for further interrogation until an attorney is present. (*Minnick v. Mississippi* (1990), 498 U.S. 146, 150, 112 L. Ed. 2d 489, 495, 111 S. Ct. 486, 489; *Edwards v. Arizona* (1981), 451 U.S. 477, 484-85, 68 L. Ed. 2d 378, 386, 101 S. Ct. 1880, 1884-85; *Miranda v. Arizona* (1966), 384 U.S. 436, 473-74, 16 L. Ed. 2d 694, 723, 86 S. Ct. 1602, 1627-28.) If the police subsequently initiate a discussion with the suspect in the absence of counsel, any statements by the suspect are presumed involuntary even if the suspect executes a waiver and his or her statements would be considered voluntary under traditional standards. (*McNeil v. Wisconsin* (1991), 501 U.S. 171, 177, 115 L. Ed. 2d 158, 167-68, 111 S. Ct. 2204, 2208; *Michigan v. Harvey* (1990), 494 U.S. 344, 350, 108 L. Ed. 2d 293, 302, 110 S. Ct. 1176, 1180.) However, a suspect may subsequently waive the right to counsel by initiating

further communications, exchanges or conversations with the police. *People v. Hicks* (1989), 132 Ill. 2d 488, 492, 548 N.E.2d 1042.

■ To show waiver, the State must establish that it was a knowing and intelligent waiver under the totality of the circumstances, including that the suspect, not the police, reopened the conversation. (*Oregon v. Bradshaw* (1983), 462 U.S. 1039, 1046, 77 L. Ed. 2d 405, 413, 103 S. Ct. 2830, 2835; *Hicks*, 132 Ill. 2d at 492.) To determine whether a suspect has waived his or her right to have counsel present during custodial interrogation, there is a two-step process. (*Hicks*, 132 Ill. 2d at 493.) First, it must be shown that the suspect initiated the conversation in a manner evincing a willingness and a desire for a generalized discussion about the investigation. Inquiries by either the suspect or police relating to routine incidents of the custodial relationship are not *Edwards*-type inquiries because they do not represent a desire to open up a more generalized discussion relating directly or indirectly to the investigation. (*Bradshaw*, 462 U.S. at 1045, 77 L. Ed. 2d at 412, 103 S. Ct. at 2834-35.) For instance, the police officer may offer the suspect a cup of coffee or the suspect may ask to use the restroom.

Second, the court must look to see whether the suspect's initiation of a conversation combined with the totality of the other circumstances demonstrated that he or she knowingly and intelligently waived his or her right to an attorney's presence during questioning. (*Hicks*, 132 Ill. 2d at 493.) Any waiver by the suspect must be unbadgered. (*Minnick*, 498 U.S. at 150, 112 L. Ed. 2d at 496, 111 S. Ct. at 489.) This is designed to prevent police from coercing a suspect into waiving his or her previously asserted *Miranda* rights. *McNeil*, 501 U.S. at 177, 115 L. Ed. 2d at 168, 111 S. Ct. at 2208; *Harvey*, 494 U.S. at 350, 108 L. Ed. 2d at 302, 110 S. Ct. at 1180.

The focus is on the state of mind of the suspect, not the police. (*Arizona v. Roberson* (1988), 486 U.S. 675, 687, 100 L. Ed. 2d 704, 717, 108 S. Ct. 2093, 2101; *People v. Young* (1992), 153 Ill. 2d 383, 401, 607 N.E.2d 123.) The Supreme Court explained the rationale underlying the *Edwards* rule by stating:

> "[I]f a suspect believes that he is not capable of undergoing such questioning without advice of counsel, then it is presumed that any subsequent waiver that has come at the authorities' behest, and not at the suspect's own instigation, is itself the product of the 'inherently compelling pressures' [of custodial interrogation] and not the purely voluntary choice of the suspect." *Roberson*, 486 U.S. at 681, 100 L. Ed. 2d at 713, 108 S. Ct. at 2097-98.

■ In this case, there was no *Edwards* violation because defendant reinitiated the conversation. Once defendant stated that he

wanted an attorney present, Detective Soreghan told defendant that they were going to stop questioning him until an attorney could be appointed. Defendant then asked how long that would be, and Soreghan responded that an attorney would be appointed to represent him in court. Neither defendant's question nor Soreghan's answer was a reinitiation of the conversation.

However, defendant then stated that he wanted to tell them the truth so that he could tell his side of the story and why. With that statement, defendant reinitiated the conversation with the police in a manner evincing a willingness and desire for a generalized discussion about the investigation.

Again, Soreghan told defendant that they would not question him any further if he wanted an attorney present, and defendant responded that he would tell them what happened without an attorney being present. Given the totality of the circumstances, we conclude that defendant knowingly and intelligently waived his right to the presence of an attorney during the interrogation.

If Soreghan had told defendant, without being asked, that an attorney would not be appointed until the court did so, that would have been an *Edwards* violation. In that instance, Soreghan would have been coercing defendant into speaking to the police. But that is not what occurred in this case. Soreghan merely answered defendant's question. There was no coercion. It was only when defendant stated that he wanted to speak to the police officers without an attorney that there was a reinitiation of the conversation.

Although there was no *Edwards* violation in this case, we suggest that in similar cases, it would be good public policy for the police to be required to restate the suspect's *Miranda* rights. That would help eliminate any ambiguity as to whether the suspect understands that he or she is waiving the right to an attorney during interrogation.

■ Related to the *Edwards* issue is whether defendant was denied his sixth amendment right to effective assistance of counsel because his attorney did not move to suppress his confession or otherwise raise the issue at trial. Defendant argues that his attorney's failure cannot be considered a trial tactic, but was a deficient performance. Defendant maintains that the professional norm would be to challenge the unconstitutionally obtained confession. Since defendant considers the impact of his confession on the trial's outcome as greatly significant, he maintains that his attorney's failure to object at trial necessarily rendered the proceeding unreliable and fundamentally unfair. Thus, he concludes there was a reasonable probability that, but for his attorney's unprofessional error, the outcome of the trial would have been different.

In order to establish ineffective assistance of counsel under *Strickland v. Washington* (1984), 466 U.S. 668, 687, 80 L. Ed. 2d 674, 693, 104 S. Ct. 2052, 2064, a defendant generally must prove that his or her counsel was deficient and that he was prejudiced by that deficiency. (*People v. Albanese* (1984), 104 Ill. 2d 504, 525, 473 N.E.2d 1246.) Prejudice requires showing that the counsel's errors were so serious that the defendant was deprived of a fair trial. (*Strickland*, 466 U.S. at 687, 80 L. Ed. 2d at 693, 104 S. Ct. at 2064.) To show prejudice, the defendant must demonstrate that there was a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. (*Strickland*, 466 U.S. at 694, 80 L. Ed. 2d at 698, 104 S. Ct. at 2068; *People v. Lewis* (1984), 105 Ill. 2d 226, 246, 473 N.E.2d 901.) In making a determination of prejudice, the court must examine the totality of the circumstances. *Strickland*, 466 U.S. at 695, 80 L. Ed. 2d at 698, 104 S. Ct. at 2069.

Based on our finding that there was no *Edwards* violation and that defendant's confession was admissible, the defense attorney's failure to move to suppress the confession or raise it during the trial did not prejudice defendant. As a result, there was no ineffective assistance of counsel.

Next, defendant asserts that the trial court abused its discretion when it sentenced him to 60 years' imprisonment even though it was within the statutory limitations for first-degree murder. After considering the arguments and the cases cited by both parties, we affirm defendant's sentence. The trial court considered the facts of this case; defendant's problems in early childhood; defendant's physical condition; Dr. Wetzel's report on defendant's mental capacities, intelligence, skills, and capabilities; defendant's conduct in court; and the lack of any disciplinary problems in jail. The trial court did not mention defendant's steady relationship with his live-in girl friend, his struggle to gain an education, his drug and alcohol abuse since the age of nine years, or that his actions were not premeditated.

Before a reviewing court can modify a sentence, it must find that the punishment clearly departs from the spirit and the purpose of fundamental laws and from the Illinois Constitution, which requires that the sentence be proportionate to the nature of the offense and the possibilities of rehabilitation. *People v. Haepp* (1990), 194 Ill. App. 3d 207, 210, 550 N.E.2d 1194; *People v. Treadway* (1985), 138 Ill. App. 3d 899, 904, 486 N.E.2d 929.

If there was a clear abuse of discretion, the reviewing court may reduce the sentence imposed by the trial court. (*People v. La Pointe* (1981), 88 Ill. 2d 482, 492, 431 N.E.2d 344.) Factors to consider in reducing a sentence on the basis of rehabilitative potential include

(1) a poor social environment; (2) a limited education; (3) an expression of a desire to further an education; (4) a very young age (*People v. Steffens* (1985), 131 Ill. App. 3d 141, 152, 475 N.E.2d 606); and (5) alcoholism when the offense was committed after drinking (*Treadway*, 138 Ill. App. 3d at 905).

█ Defendant was eligible for the death penalty, but was sentenced to 60 years' imprisonment instead. Although there were significant mitigating factors that demonstrated some rehabilitative potential, we must also consider the facts of this case, the injuries incurred, and defendant's juvenile record for murder. Taking all the factors into consideration, we find that the trial court did not abuse its discretion in sentencing defendant to 60 years' imprisonment.

Accordingly, we affirm the circuit court judgment.

Affirmed.

GREIMAN, P.J., and RIZZI, J., concur.