**Dennis EMERSON, Petitioner–Appellant, Cross–Appellee,**

v.

**Richard B. GRAMLEY, Warden, Pontiac Correctional Center, Respondent–Appellee, Cross–Appellant.**

Nos. 95–2988, 95–3018.

United States Court of Appeals, Seventh Circuit.

Argued April 23, 1996.

Decided July 30, 1996.

Rehearing and Suggestion for Rehearing En Banc Denied Sept. 19, 1996.*

---

* Hon. Kenneth F. Ripple voted to grant the petition. Hon. Walter J. Cummings did not partici-pate in the vote for rehearing en banc.

Prentice H. Marshall, Jr., Linton Jeffries Childs (argued), Jay Tyson Covey, Sidley & Austin, Chicago, IL, for Petitioner–Appellee in No. 95–2988.

Michael M. Glick (argued), Rita M. Novak, Office of the Atty. Gen., Chicago, IL, for Respondent–Appellant in No. 95–2988.

Prentice H. Marshall, Jr., Linton Jeffries Childs (argued), Jay Tyson Covey, Sidley & Austin, Chicago, IL, Marshall J. Hartman, Chicago, IL, for Petitioner–Appellant in No. 95–3018.

Rita M. Novak, Office of the Atty. Gen., Chicago, IL, James E. Fitzgerald, Asst. States Atty., (argued), Chicago, IL., for Respondent–Appellee in No. 95–3018.

Before POSNER, C.J., and BAUER and RIPPLE, Circuit Judges.

POSNER, Chief Judge.

Dennis Emerson (also known as Dennis Jackson) was convicted by a jury in an Illi-

nois state court of a murder committed in 1979 when he was 27 years old, was sentenced to death by the same jury, won a new trial from the state supreme court for trial error, *People v. Emerson,* 97 Ill.2d 487, 74 Ill.Dec. 11, 455 N.E.2d 41 (1983), at his second trial was again convicted and sentenced to death, appealed unsuccessfully, *People v. Emerson,* 122 Ill.2d 411, 119 Ill.Dec. 250, 522 N.E.2d 1109 (1987), failed to obtain any relief in state postconviction proceedings, *People v. Emerson,* 153 Ill.2d 100, 180 Ill.Dec. 46, 606 N.E.2d 1123 (1992), and having thus exhausted his state remedies sought habeas corpus in the federal district court in Chicago on the ground that his counsel at the second trial had been incompetent in both the guilt and sentencing phases of the trial. The district court rejected the challenge so far as the guilt phase was concerned but accepted it with regard to sentencing and ordered that he be resentenced. *United States ex rel. Emerson v. Gramley,* 883 F.Supp. 225 (N.D.Ill.1995). Both sides appeal.

The day after the appeals were argued to us, President Clinton signed into law the Antiterrorism and Effective Death Penalty Act of 1996, Pub.L. 104–132, 110 Stat. 1214, which among other things amends 28 U.S.C. § 2254(d) to require federal courts in habeas corpus proceedings to give greater deference to the determinations made by state courts than they were required to do under the previous law. Although three months have elapsed since the enactment of this highly publicized law, the state has not asked us to consider its possible bearing on these appeals, and we consider the issue waived. *Rivera v. Director, Department of Corrections,* 915 F.2d 280, 283 (7th Cir.1990). Of course, if the issue goes to the subject-matter jurisdiction of the federal district court, it cannot be waived, and we must consider it on our own. But we do not think it does. It affects the scope of federal judicial review of state court determinations rather than the power of review. *Cf. Eaglin v. Welborn,* 57 F.3d 496, 498–99 (7th Cir. 1995) (en banc).

Here, briefly, are the facts out of which this proceeding arises. Robert Ray, an acquaintance of Emerson's, owned and operated a bar in Chicago. On the fatal day Emerson called Ray several times and told him that he was coming to see him. Emerson arrived with his brother Richard Jackson between 1:15 a.m. and 2 a.m., shortly after the bar closed. Ray, Emerson, and Jackson sat and talked in Ray's apartment, which was at the back of the bar. Ray's girlfriend, Delinda Byrd, joined them. According to Ray's testimony at both trials, at some point after she arrived and Ray returned from a brief trip to a store to buy cigarettes Emerson pulled out a gun, ordered Ray and Byrd to lie on the floor, bound their hands and feet with electrical cord, and then ransacked the apartment for guns and jewelry. He also searched the two victims and, finding about $600 on Byrd, took it. Jackson found a blade from a broken scissors or shears in the kitchen of the apartment and gave it to Emerson, telling him, "Here, Dennis, use these." Emerson stabbed Ray twice in the chest and Byrd five times in the back. Then he set a fire in the bedroom of the apartment and with Jackson's help dragged Ray and Byrd into the bedroom and fastened the door from the outside with a coat hanger. Emerson and Jackson then left the apartment.

Ray managed to free his hands, hobble over to the window (his feet were still tied together), and fall out, dropping six or eight feet to the bottom of the airshaft between his building and the one next door. Byrd managed to follow him into the airshaft. Ray untied his feet and her hands and feet. Ray (but not Byrd) was able to get into a different room of the apartment through a window giving on the airshaft. He rushed out of the building, which was now burning furiously. The fire department had already been summoned. Firemen arrived at about 4 a.m., but were unable to extricate Byrd from the airshaft until they put out the fire. By then she was dead from burns and loss of blood. Ray told the police at the scene that Jackson and Emerson had been the assailants, and police immediately went to the brothers' home, arriving at 4:15 a.m. but finding no males there. Ray spent nine days in hospital recovering from the stab wounds and smoke inhalation.

Jackson and Emerson were tried together. Although Jackson was found guilty of murder along with Emerson, he was not sentenced to death, perhaps because, unlike Emerson, he had not done the stabbing or burning and, also unlike Emerson, he was not convicted of arson. Both were convicted of attempted murder and armed robbery as well as of murder. Jackson, like Emerson, won a new trial on the basis of trial error. *People v. Jackson*, 119 Ill.App.3d 951, 75 Ill.Dec. 891, 458 N.E.2d 59 (1983). In the second round, Jackson and Emerson were again tried together, but Jackson waived a jury, with the result that the judge (the same judge, incidentally, who had presided at the first trial of the two defendants) was the trier of fact in his case. The judge convicted him, and this time the conviction was upheld on appeal. *People v. Jackson*, 154 Ill.App.3d 320, 107 Ill.Dec. 425, 507 N.E.2d 89 (1987).

Ray was the principal witness for the prosecution at both trials, for no fingerprint or other physical evidence tying the defendants to the crime was produced and neither the half scissors or shears used in the stabbings nor any of the things stolen from Ray's apartment have ever been found. At Emerson's first trial, Ricky Jackson, another of Emerson's brothers, testified that he (Ricky) was not at Emerson's house the night of the murder. Emerson took the stand in that trial, denied any involvement in the crimes, and was impeached with his lengthy criminal record. He testified, contradicting Ricky, that Ricky had been sleeping on the couch in the living room of their home on the fatal night while he was in the basement listening to records until 5 a.m. He also testified, contradicting himself, that he had left home at 3:30 or 4 to visit his ex-wife. He testified that before the murder he had lent Ray $5,000 from the proceeds of a bank robbery and had been unable to obtain repayment. The theory of the defense was that Ray had accused Emerson of participation in the murder in order to avoid having to repay the loan. The jury wasn't buying, but Emerson's conviction was reversed because of improper statements by the prosecution and erroneous evidentiary rulings, including the admission of a prior consistent statement by Ray. Despite the strength of the case against Emer-

son, the state supreme court held that the errors and improprieties had not been harmless.

The lawyers who represented Emerson at his first trial did not represent him at his second trial, apparently because he could no longer afford to pay their fees. A lawyer named Earl Washington was appointed at the request of Emerson and his family to represent him. But a year later, shortly before the trial, Washington resigned the appointment because of "serious philosophical differences" with Emerson; the nature of those differences is not known. An assistant public defender named James Sammons was appointed to succeed Washington. Sammons had extensive trial experience, but it was not recent, because he had been a supervisor in the public defender's office for several years. He had tried one capital murder case in his career, but that had been before the U.S. Supreme Court developed its complicated jurisprudence of capital punishment.

Sammons reviewed the transcript of the first trial and met with Emerson once or twice before the second. The total length of this meeting or these meetings is unclear; it may have been as short as 45 minutes, or it may have exceeded an hour and a half. Sammons decided to follow a different strategy at the forthcoming trial from the one that had been employed by Emerson's lawyers at the first trial: he would try to plant in the minds of the jurors, through cross-examination of Ray, the suspicion that Ray himself had murdered Byrd. Sammons stated in his deposition that before the trial began he had told Emerson and Richard Jackson "that my feeling was that Robert Ray was lying and that he would only have one or two possible motives for lying, and that one of them being himself was responsible for the arson, for the murder, and they [Emerson and Jackson] seemed to find no fault with that theory whatsoever." Elaborating, Sammons described his theory of defense in the following words: that "Robert Ray was lying; that he was lying about being secured in the burning room by means of wire binding the door closed; that he was lying about being beaten and stabbed; that he was lying about the way he described what happened immediate-

ly after the offense.... [I]t's quite common for persons who commit crimes in their own abode or place of business to set fire to the place to more or less cover what happened."

Sammons' strategy did not require that he call any witnesses. He did not want to call any. The only possible witnesses for the defense would have been members of Emerson's family, testifying as alibi witnesses, and it was plain from the first trial that Emerson's alibi would be ripped apart. Sammons wanted to base the defense on undermining the credibility of the prosecution's key witness. There was no other evidence of Emerson's guilt besides Ray's testimony. So if the jury could be made to doubt the truthfulness of that testimony, it might decide that there was reasonable doubt and acquit without Emerson or his family having to testify only to get skewered on cross-examination.

The trial began and Sammons did manage to elicit from Ray that Ray had had arguments (though not fights) with his girlfriend and had not tried to staunch her bleeding or help her out of either the apartment or the airshaft. And he used Ray's testimony that Emerson had telephoned him repeatedly before coming over to intimate that such conduct was inconsistent with Emerson's having intended to rob Ray, since if before Emerson arrived Ray happened to tell anyone that Emerson was coming to visit him this would immediately cast suspicion on Emerson when the murder was discovered. Sammons also argued that it was unlikely that Emerson would have let Ray leave to buy cigarettes if he had been planning to rob him, since Ray might become suspicious and not return or might happen to mention to someone that Emerson and Jackson were in his apartment. Sammons' cross-examination of Ray was brief and, indeed, judging from the transcript, rather perfunctory, but it would have given Sammons some ammunition for use in closing argument had that argument not been derailed, as we shall see, by an unexpected development.

At a break in the case, Emerson announced, referring to Sammons, "I don't want this guy here." He said that Sammons was "not doing anything.... [H]e ain't said nothing to me about no strategy ... [and]

when I sit over there asking about my people testifying, he tell me he not going to let my people testify." (Before the second trial, Emerson and Richard Jackson expressed continual dissatisfaction with their lawyers and peppered the trial judge with pro se motions, bypassing their lawyers.) Emerson was upset in part because Jackson's lawyer had asked more questions in cross-examining Ray than Sammons had, though the questions hadn't undermined Ray's testimony in the slightest. Emerson may have sensed a lack of energy or commitment in Sammons and may not have understood his strategy; indeed, it is conceivable that he did not know what it was. The judge refused to give Emerson a new lawyer in the middle of the trial, whereupon Emerson joined his brother—who did not like the idea of the jury being present when he had waived a jury trial—in the holding cell behind the court.

After the completion of the prosecution's case in chief, Emerson asked Sammons to call his mother and his brothers Ricky and Richard Jackson as witnesses for the defense. Sammons made clear that "all of this is over my advice to Mr. Emerson." He could have refused to call the witnesses, *see Weber v. Israel,* 730 F.2d 499, 508 n. 7 (7th Cir.1984), because the decision whether or not to call a witness is a lawyer's tactical decision on which consultation with the client is not required. E.g., *United States v. Ramos,* 832 F.2d 85, 88 (7th Cir.1987); *United States v. Curtis,* 742 F.2d 1070, 1074–75 (7th Cir.1984) (per curiam). This is provided that the decision rests on an adequate foundation, e.g., *Montgomery v. Petersen,* 846 F.2d 407, 412–14 (7th Cir.1988), but Emerson does not cite Sammons' acceding to his direction as an instance of incompetent representation. Ricky Jackson tried to give testimony concerning Emerson's alleged loan, but this was objected to as hearsay and he stepped down without providing anything helpful to the defense. Sammons did not try to get the evidence of the loan into the case by some other means.

Emerson's mother, who would have testified that Emerson was home until 3:30 a.m. on the night of the murder, then took the stand. Sammons said he had no questions to

ask her, thinking that Emerson would be questioning her (Emerson had done some of the questioning of Ricky). But Emerson did not question her, because as soon as she was seated in the witness box he demanded to be returned to the lock-up. He was taken away, and she stepped down without testifying.

He came back, and wanted his brother Richard called. The judge, till then (and later) a model of patience, was becoming exasperated. He said, "I believe now all Mr. Emerson is attempting to do is to foul up the record as he has done throughout the entire trial, tried to delay it, antics at this time only shows me that all he wants to do is attempt to foul up the trial." Nevertheless, the judge agreed to have Richard called to the stand. Against the advice of his lawyer, Richard waived his Fifth Amendment right not to testify against himself (for he was still on trial too) and proceeded to corroborate virtually everything to which Ray had testified—including Richard Jackson's own role in the murder—except the identity of the other murderer. Richard said it was not Emerson but "Phillip Anderson." The existence of "Phillip Anderson" has never been confirmed. Jackson, who had not testified at either of his own trials, admitted that he had never told this story to anyone before. Sammons had no reason to think that Jackson would testify to anything but an alibi, since in the conversation that Sammons had had with Emerson and Jackson before the trial both defendants had said that they did not know who the murderer was.

Although Richard Jackson did mention in his testimony that Ray had owed Dennis Emerson some money (so the evidence of the loan came in after all), the testimony taken as a whole, in which he admitted that he and Anderson, not Ray, had killed Byrd, sank Sammons' theory of defense. Closing argument followed shortly upon Jackson's testimony, and Sammons found himself with very little to say. He did not attempt to argue to the jury that Emerson had not committed the murder. He contented himself with arguing that Emerson had not planned to rob Ray; exactly how that argument could help his client remains obscure. At the sentencing hearing, held the next day before the same jury, Sammons had nothing to say. He had made no attempt to interview witnesses who might testify on Emerson's behalf at the sentencing hearing; he had not, so far as appears, even discussed possible approaches to take at the hearing. Emerson instructed him to present neither evidence nor argument at the hearing and declined to present witnesses or make any statement himself.

Regarding the guilt phase of the trial as distinct from the sentencing phase, Emerson argues that Sammons should have stuck with the strategy of the first trial. Although unsuccessful, that strategy had had enough merit to dissuade the state supreme court from finding that the errors committed at that trial had been harmless. Emerson argues further that Sammons should have conferred at greater length with him before the trial; should have investigated the possibility of a convincing alibi defense rather than rely on the transcript of the first trial to conclude that such a defense would be futile; should not have embarked on a completely new theory of defense without some preliminary investigation; should have given an opening statement; should have cross-examined Ray more vigorously; should have called Emerson as a witness; should not, as he virtually did, concede Emerson's guilt in his closing statement; and should have looked for evidence of mitigation.

Chief Judge Aspen rejected all the claims of ineffective assistance of counsel at trial. Some of them he rejected on the basis of waiver. These were the grounds that the state supreme court had rejected in Emerson's state postconviction proceeding on the basis of res judicata: Emerson could have presented the claims in his direct appeal but did not. Chief Judge Aspen thus equated res judicata and waiver as defenses to grounds for challenging a conviction that might have been presented earlier. Was he right to do so? Probably not. The law of the state that issues the judgment determines its preclusive scope in any subsequent federal proceedings, 28 U.S.C. § 1738, and it appears that the Illinois courts intend their judgments in criminal appeals to have preclusive effect only in subsequent proceedings in those courts. *People v. Kokoraleis,* 159 Ill.2d

325, 202 Ill.Dec. 279, 283, 637 N.E.2d 1015, 1019 (1994); *cf. Ylst v. Nunnemaker,* 501 U.S. 797, 804 n. 3, 111 S.Ct. 2590, 2595 n. 3, 115 L.Ed.2d 706 (1991); *Prihoda v. McCaughtry,* 910 F.2d 1379, 1385 (7th Cir. 1990). If you waive or forfeit a claim, it's ordinarily barred forever, in any court system. A familiar example is a rule requiring a contemporaneous objection to the admission of evidence. Although we don't usually think of res judicata as having quite that force, the practical effect, at least within a unitary court system, is much the same: if you "split" your claim, reserving part of it for a later suit, the defendant will be able to interpose the defense of res judicata to that suit, barring you from litigating the claim. From language in the state supreme court's opinion in the postconviction case ("we find that the defendant did not present any claim which was not barred by the doctrine of *res judicata* or waiver," 180 Ill.Dec. at 50, 606 N.E.2d at 1127), it appears that that court may indeed have thought of waiver and res judicata as synonymous. The decision preceded *People v. Kokoraleis,* however, raising the question whether the later decision changed the law and if so with retroactive effect. Probably not; *Kokoraleis* does not purport to be announcing a new rule. We need not plunge deeper into this briar patch. For the state argues, we think correctly, that none of the possibly waived claims of ineffective assistance, or for that matter all the waived and nonwaived together, deprived Emerson of his constitutional right to the effective assistance of counsel during the guilt phase of his second trial.

█  The transcript of the first trial—which could have been used to impeach any contradictory evidence at the second trial by witnesses who had testified at the first, cf. Fed.R.Evid. 801(d)(1)(A)—would have suggested to the reader that the alibi defense was going nowhere and that Emerson's denials of guilt, given his lengthy criminal record and contradictory alibi defense, would have little appeal to a jury even if the jurors believed that Ray had owed Emerson money—money Emerson had obtained from a bank robbery. The alternative strategy of "trying the victim" was desperate. But the situation was desperate, and we cannot say

that Sammons was incompetent in deciding to adopt it. The evidence before the district judge concerning Sammons' representation did not require the judge to find that Sammons had adopted this strategy over Emerson's objections, though in the course of the trial Emerson repudiated it. The waiver of opening argument has no significance, given the strategy: Sammons would not want to tip his hand to Ray and the prosecutors before his cross-examination of Ray began. Sammons could have reserved opening argument to the close of the state's case, but there would have been no point since he was not planning to present any witnesses. The close of the prosecution's case in chief would be the end of the evidentiary phase of the case. A reserved opening argument would step on the heels of the closing argument.

The strategy was okay, the execution of it deplorable. Sammons conducted no investigation, cross-examined Ray weakly, and was inept in his efforts to extract evidence about the loan from Ricky Jackson. The closing argument was a total flop, though here the blame may lie more with Emerson than with Sammons. Emerson insisted, against his lawyer's judgment, on calling his brother Richard Jackson as a witness. Nothing a mother or brother would testify to was likely to help Emerson, but Richard Jackson's testimony turned out to be a disaster because it corroborated Ray's testimony except in the incredible substitution of "Phillip Anderson" for Dennis Emerson. It is mere speculation that Sammons could have headed off this disaster by interviewing Richard Jackson and then advising Emerson not to insist on Jackson's being called as a witness. He would have been telling Emerson that even though his brother was prepared to confess his own part in the murder and exculpate Emerson, it would be better not to call him as a witness because his testimony would actually rehabilitate Ray's testimony. Advice like that if taken would have formed the cornerstone of Emerson's claim (we do not say a successful one) of ineffective assistance of counsel.

We suppose, although we have not been able to find any cases on the point, that if Emerson lost confidence in Sammons be-

cause of the latter's incompetence and re-acted by taking over his defense and making dumb decisions, like calling his brother as a witness, those decisions might be attributed to the lawyer rather than to the client. Had Sammons demonstrated incompetence at the point at which Emerson told the judge that he considered Sammons incompetent? This is difficult to say. On the one hand, he had a viable strategy which guided a cross-examination of Ray that elicited a few of the points that Sammons had wanted to elicit. Sammons had good reasons not to put on witnesses and to waive opening argument. Having read the transcript of the first trial he had less reason than would normally be the case to interview potential. witnesses, none of whom could stray far from their previous testimony without being nailed by that very transcript. And the fact that this was the rerun meant that he did not have to spend as much time conferring with his client in advance of trial as he would normally have had to do. He was a senior and experienced public defender (though subsequently demoted) and he had only a little more than a month to prepare for trial between the discharge of Washington and the commencement of the second trial. Emerson's current lawyers, whose zeal and competence in the advocacy of their client's cause cannot be doubted (their briefs in this court total 101 pages), describe Jackson's testifying as a "misfortune" rather than as the consequence of Sammons' incompetence. Emerson may have had an *idée fixe* about having "his people" testify from which no lawyer could have dissuaded him. On the other hand, it is not at all clear that Sammons had explained his strategy adequately to Emerson or won the latter's acquiescence in it, and the perfunctory character of his cross-examination of Ray may reasonably have seemed to Emerson a sign that his lawyer had abandoned his cause.

■ The misfortune of Richard Jackson's testifying put Sammons off his stride, perhaps without fault on his part; but he should have done better than to offer a perfunctory closing argument in which virtually the only thing he said on his client's behalf was that Emerson had not intended to commit armed robbery, which was irrelevant. The closing argument occupies only two pages of the transcript, and half of it is taken up by the prosecutor's objections. We need not decide, however, whether in the closing argument, or even earlier, Sammons fell below the minimum standard of representation required of a criminal lawyer. In order for this to be a ground for upsetting the conviction, the lapse would have to be prejudicial, which is to say likely to have made a difference in the outcome of the trial. *Strickland v. Washington,* 466 U.S. 668, 695, 104 S.Ct. 2052, 2068–69, 80 L.Ed.2d 674 (1984); *United States v. Wolf,* 787 F.2d 1094, 1100 (7th Cir.1986). This condition is not satisfied. Given Richard Jackson's testimony, which corroborated the very aspects of Ray's testimony that Sammons had tried to undermine in his cross-examination of Ray, Emerson simply had no defense to the charges against him. He would have been in better shape had Sammons repeated the strategy followed at the first trial. But that is the wisdom of hindsight. Had Jackson not testified, Sammons' strategy would have been intact. It was not a winning strategy, but neither was the alibi defense attempted at the first trial. It was a reasonable strategy given the lack of a good alternative, and that is all that the Constitution requires.

Even if Jackson's testifying can be laid at Sammons' feet, and even if Sammons' cross-examination of Ray was too lackluster to come up to the minimum standard for the representation of a criminal defendant at trial, Emerson has failed to show that he was harmed. He had no chance of acquittal. We know this because Richard Jackson's lawyer, who cross-examined Ray at length and is not claimed to have been incompetent, did not lay a glove on Ray. After two trials and vigorous cross-examination by at least three lawyers (two at each trial, but we are excluding Sammons' cross-examination), Ray's testimony was intact—consistent both internally and with all the physical and other evidence presented. Against this, Emerson had only an unbelievable alibi defense and the unbelievable testimony of his brother about a nonexistent "Phillip Anderson."

We turn to the sentencing phase of the case. Under Illinois law, both when Emer-

son was sentenced and today, if the jury finds (beyond a reasonable doubt) at least one aggravating circumstance of murder, and finds no mitigating circumstances, a sentence of death is mandatory. Ill.Rev.Stat. ch. 38, para. 9–1(g) (1979); 720 ILCS 5/9–1(g). Yet it is sometimes a sound defense strategy to offer no evidence of mitigating circumstances. *Darden v. Wainwright*, 477 U.S. 168, 186, 106 S.Ct. 2464, 2474, 91 L.Ed.2d 144 (1986). The narratives that defense counsel and their "mitigation specialists" present often contain material that the jury is likely to consider aggravating rather than mitigating. *Burger v. Kemp*, 483 U.S. 776, 793, 107 S.Ct. 3114, 3125, 97 L.Ed.2d 638 (1987); *Stewart v. Gramley*, 74 F.3d 132, 137 (7th Cir.1996). The mitigation specialist and the mitigation witnesses tell the story of the defendant's life, and it is often a life of crime. So in a case in which the jury might doubt the prosecution's evidence of aggravating circumstances, the presentation of evidence of mitigating circumstances can sink the defendant by filling in the gaps in the prosecution's case. As a matter of fact, the mitigation story that Emerson's current lawyers say that Sammons should have presented contains a number of criminal acts (the arson, the armed robbery, the attempted murder, and a number of Emerson's previous crimes) that were omitted from the prosecution's enumeration of aggravating circumstances.

But fear of strengthening the prosecutor's argument for the death penalty was not the reason why no mitigation evidence was presented at Emerson's second trial. (No such evidence was presented at his first, either; we have not been told why.) Sammons did not advise Emerson, and so far as we know did not believe, that presenting evidence in (attempted) mitigation would only make matters worse. Rather, Emerson told Sammons, and then the judge, that he didn't want Sammons to present any evidence or argument in mitigation. Why not? By this time Emerson was, or at least pretended that he was, thoroughly disgusted with Sammons; given Sammons' poor performance at the closing argument on guilt, held just one day earlier, Emerson's loss of confidence in Sammons cannot be assumed to be entirely feigned. And Sammons had failed to conduct *any*

investigation, however brief, into the possible existence of evidence of mitigating circumstances. Compare *Burger v. Kemp, supra*, 483 U.S. at 790–95, 107 S.Ct. at 3123–26. Without such an investigation, Sammons could not advise Emerson whether to try to present evidence of such circumstances. Nor did either Sammons or the trial judge warn Emerson of the fell consequences of failing to establish some mitigating circumstances, without which (because the evidence of aggravating circumstances was overwhelming) a sentence of death was certain unless the jury disobeyed the judge's instructions. Previous cases in which a decision not to introduce evidence in mitigation has been found consistent with effective assistance of counsel have emphasized that lawyer and judge warned the defendant of the consequences of the decision. *Blystone v. Pennsylvania*, 494 U.S. 299, 306 n. 4, 110 S.Ct. 1078, 1083 n. 4, 108 L.Ed.2d 255 (1990); *Silagy v. Peters*, 905 F.2d 986, 1007 (7th Cir.1990). There were no warnings here, so far as the record discloses.

■ This is not a case like *Darden* in which the decision not to put on a case in mitigation is a strategic decision made only after an investigation of the possibilities. Sammons' failure to investigate and failure to warn of the consequences of standing mute (a failure that the trial judge might have cured by warning Emerson himself, but did not) brought his representation of Emerson during the sentencing phase below the minimum level of competent representation—unless it can be said that Emerson would have refused to permit argument or evidence no matter what Sammons or the trial judge had said and done. We do not think it is possible to say this. Emerson did not know what an investigation of his personal history would bring out that might help him with the jury and was not told that without an effort to persuade the jury to exercise lenity he was doomed.

Given the unusual circumstances that we have recounted, Emerson's waiver of his procedural rights at the sentencing hearing cannot be considered a knowing waiver to which he should be held. And this brings us to the question whether there is any realistic

possibility that Sammons' failures at the sentencing hearing made any difference in the outcome. If not, we cannot disturb the sentence. *Schneider v. Delo,* 85 F.3d 335, 339–41 (8th Cir.1996).

We know now what a full investigation would have revealed: that Emerson is a dull normal (IQ in the 80s) who was seriously wounded as a bystander to a holdup when he was 8 years old, and who had a continuous record of truancy and criminality from early youth (after the wounding) to the murder. No theory is offered as to why being wounded as a child would turn a person into a murderer as an adult, rather than making the adult gun-shy. The bulk of the mitigation specialist's report narrates a career of truancy and crime far lengthier than what had been recounted to the jury by the prosecution. Even if the IQ and the wound could be thought mitigating, these things seem outweighed or at least offset by the mitigation specialist's additional evidence of criminal and other antisocial behavior.

These considerations would be decisive against Emerson if *some* evidence in mitigation had been before the jury and the question was whether more should have been, as in *Burger v. Kemp* or *Stewart v. Gramley,* or perhaps even if, as in *Stewart,* the sentencer had been the judge rather than a jury. With no evidence of mitigation before the jury despite irrefutable evidence of aggravating circumstances, with need to convince only one of twelve jurors to refuse to go along with a death sentence, and with no statutory or caselaw definition of mitigating circumstances that might enable us to say that the mitigating circumstances found in the investigation by Emerson's current lawyers are in fact irrelevant, *see People v. Ramey,* 152 Ill.2d 41, 178 Ill.Dec. 19, 34, 604 N.E.2d 275, 290 (1992); *People v. Hope,* 168 Ill.2d 1, 212 Ill.Dec. 909, 930, 658 N.E.2d 391, 412 (1995), the possibility that a case in mitigation along the lines devised by these lawyers might have saved Emerson from the death penalty cannot confidently be reckoned trivial. The mitigation specialist's 30-page single-spaced report is a moving narrative of a life that one juror in twelve might find so bleak, so deprived, so harrowing, so full of horrors (in-

cluding the death of Emerson's child, possibly strangled by her mother, and the death of one of Emerson's brothers by shooting), as to reduce Emerson's moral responsibility for the murder of Byrd to a level at which capital punishment would strike that juror as excessive or one or more of the jurors would think Emerson deserving of mercy. *See, e.g., People v. Starnes,* 273 Ill.App.3d 476, 210 Ill.Dec. 201, 205, 652 N.E.2d 1177, 1181 (1995); *People v. Morrow,* 269 Ill.App.3d 1045, 207 Ill.Dec. 607, 610, 614, 647 N.E.2d 1100, 1103, 1107 (1995).

*Starnes* was a bench trial; so it provides particularly strong support for the proposition that Emerson might have avoided the death penalty had evidence in mitigation been presented. In *Stewart,* the fact that the jury was not swayed by the evidence in mitigation that was presented made it highly unlikely that additional such evidence, unimpressive in itself, would have made a difference. That judgment cannot be made here, since no evidence whatsoever in mitigation, or even argument, was presented. Although the state supreme court observed that Emerson "has not brought to our attention any mitigating evidence that should have been introduced for the jury's consideration," 119 Ill.Dec. at 261, 522 N.E.2d at 1120, this was before the investigation by the mitigation specialist, and the state does not argue that Emerson's failure to conduct the investigation earlier should operate as a waiver of his claim.

We conclude that, in the unique circumstances of this case, Sammons' subminimum representation of Emerson at the sentencing hearing may have been responsible for the death sentence—not certainly of course, but with sufficient probability to establish a denial of the right to effective assistance of counsel at the sentencing phase. We therefore agree with the district court that Emerson's sentence of death must be set aside and a new sentencing hearing held.

AFFIRMED.

RIPPLE, Circuit Judge, concurring in part and dissenting in part.

I concur in my colleagues' decision that the petitioner received ineffective assistance of

counsel at the sentencing stage of the state proceedings and that, consequently, the sentence of death imposed at those proceedings cannot stand. I respectfully differ with my colleagues as to whether the inadequate performance of counsel can be limited, as a conceptual or practical matter, to the sentencing procedure. This is not a case in which an otherwise acceptable professional performance was marred by a significant but singular breach at sentencing. Rather, in my view, the record discloses a performance that was substandard from the beginning and cannot be said to fulfill the constitutional mandate that a defendant have adequate counsel. *See Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).

A defense counsel has a two-fold obligation to the client. First, counsel must, after careful investigation, evaluation, and consultation with his client, formulate an adequate theory of defense. Second, counsel must execute that theory in the presentation of the accused's case. In this case, counsel formulated a theory of defense in only the most marginal of ways. Discarding without adequate investigation an alibi defense that, although certainly not air tight, had been respectable in the eyes of the state Supreme Court,[1] counsel adopted, again without adequate investigation, a theory that depended on his convincing the jury that one of the victims had been the true perpetrator. This theory was, at best, only vaguely communicated to the jury and, due to the lack of preparation, it was supported by a mediocre cross-examination of the victim. This inadequate attempt to point the finger at a victim

ended in a complete rout when, at the defendant's insistence, his brother was placed on the stand and gave an account that was completely at odds with the defendant's case. Even though counsel was not immediately responsible for the presentation of this witness, the impending disaster of counsel's chosen course certainly contributed to this abrupt change in course. In *United States v. Cronic,* 466 U.S. 648, 104 S.Ct. 2039, 80 L.Ed.2d 657 (1984), the Supreme Court noted that counsel must act in the role of an advocate: "[I]f the process loses its character as a confrontation between adversaries, the constitutional guarantee is violated." · 466 U.S. at 657–58, 104 S.Ct. at 2046. In Mr. Emerson's case, the confrontation that was displayed was one between the defendant and his counsel. In my view, his defense counsel's lack of pretrial investigation, lack of consultation with his client, and lack of preparation and strategy infected the trial from its inception and created a situation so prejudicial to Mr. Emerson that it resulted in Mr. Emerson's frustrated demonstrations. Defense counsel's performance fell below an "objective standard of reasonableness" that is based on "prevailing professional norms." *Strickland v. Washington,* 466 U.S. 668, 688, 104 S.Ct. 2052, 2065, 80 L.Ed.2d 674 (1984). His performance, especially the illconsidered rejection of the far stronger alibi defense, clearly rendered the result of the trial unreliable. *Lockhart v. Fretwell,* 506 U.S. 364, 371–73, 113 S.Ct. 838, 844, 122 L.Ed.2d 180 (1993). Therefore, counsel's "salvage closing" to the jury, rather than being characterized as a redeeming performance, ought to be regarded, as a practical matter, as the

---

1. After the first trial, at which Mr. Emerson presented an alibi defense, the Supreme Court of Illinois reversed the judgment and remanded the cause for new trial on the ground of improperly admitted testimony and clearly improper, prejudicial statements by the State's Attorneys during final argument. The court concluded:

The evidence of guilt consists solely of Ray's testimony. Defendant made no inculpatory statements, ... no fingerprints were found, and there was no evidence that any of the proceeds of the robbery were in defendant's possession. Defendant denied any participation in the offense, and his testimony, if believed, would supply the motive for Ray's having charged him with the offense.

Where guilt or innocence depends entirely on the credibility of an accuser and the defendant, no error should be permitted to intervene. "Where error is shown to exist, it will compel reversal, unless the record affirmatively shows that the error was not prejudicial." Here, the record fails to show affirmatively that the improperly admitted testimony and the improper oral argument were not prejudicial. The judgment must therefore be reversed and the cause remanded ... for new trial. *People v. Emerson,* 97 Ill.2d 487, 502, 74 Ill.Dec. 11, 17, 455 N.E.2d 41, 47 (1983).

result of counsel's having painted himself into a corner earlier.

Adequacy of counsel claims are often the last gasp of a near-defunct defense. Here, however, the record discloses, from beginning to end, a lack of care and preparation that resulted in a muddled presentation that the jury could only have found to be unconvincing. Although we ought not use the power of hindsight to second-guess the tactical decisions of counsel, neither ought we use that same power to construct theories of defense for a counsel whose lack of professional effort is clear from the pages of the record.