(No. 77167.—

# THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, v. GREGORY MADEJ, Appellant.

*Opinion filed June 19, 1997.—Rehearing denied*
*September 29, 1997.*

Christina M. Tchen, James F. Martin, Pauline H. Yoo, Amarjeet S. Bhachu and Tiffanie N. Cason, of Chicago, for appellant.

James E. Ryan, Attorney General, of Springfield, and Jack O'Malley, State's Attorney, of Chicago (Arleen C. Anderson, Assistant Attorney General, of Chicago, and Renee Goldfarb and Judy L. DeAngelis, Assistant State's Attorneys, of counsel), for the People.

JUSTICE McMORROW delivered the opinion of the court:

Following a bench trial in the circuit court of Cook County, defendant, Gregory Madej, was convicted of murder (Ill. Rev. Stat. 1979, ch. 38, par. 9—1(a)(1)), felony murder (Ill. Rev. Stat. 1979, ch. 38, par. 9—1(a)(3)), rape (Ill. Rev. Stat. 1979, ch. 38, par. 11—1), deviate sexual assault (Ill. Rev. Stat. 1979, ch. 38, par. 11—3), and armed robbery (Ill. Rev. Stat. 1979, ch. 38, par. 18—2). The circuit court sentenced defendant to death on the murder and felony murder convictions. On direct appeal, this court affirmed defendant's convictions and sentences. *People v. Madej*, 106 Ill. 2d 201 (1985). The United States Supreme Court subsequently denied defendant's petition for writ of *certiorari. Madej v. Illinois*, 474 U.S. 935, 88 L. Ed. 2d 274, 106 S. Ct. 268 (1985), *reh'g denied*, 474 U.S. 1038, 88 L. Ed. 2d 586, 106 S. Ct. 608 (1985).

Defendant thereafter filed a *pro se* petition for relief pursuant to the Post-Conviction Hearing Act (Ill. Rev. Stat. 1985, ch. 38, par. 122—1 *et seq.*). His attorney filed an amended petition several years later. The circuit court dismissed the amended petition without an evidentiary hearing, and this appeal followed. 134 Ill. 2d R. 651. We now affirm the order of the circuit court.

## BACKGROUND

Barbara Doyle's naked body was found in an alley

on the north side of Chicago in the early morning hours of August 23, 1981. She had been stabbed and slashed approximately 34 times. A post-mortem examination revealed the presence of numerous abrasions over various parts of her body. Semen was found in her vagina and rectum.

At approximately 5 a.m. on the day in question, two Chicago police officers observed defendant drive through a posted stop sign on Wilson Avenue in Chicago. The officers signalled for defendant to pull over. Instead of stopping, defendant accelerated and proceeded to lead the officers on a high-speed chase. Several other police cars joined in the chase as defendant sped through red lights in excess of 80 miles per hour. Defendant eventually drove into an alley, where he tried unsuccessfully to escape on foot. When the officers arrested defendant, his hands, head, shirt, pants and undershorts were covered with blood. The automobile, which was later determined to be Barbara's, was likewise stained with blood, mostly in the area of the passenger's seat. Upon searching the vehicle, police officers recovered a large knife as well as Barbara's jeans and blouse, both of which were saturated with blood.

At the police station, defendant explained to the officers that he had been drinking at the Garage Inn tavern until 2:20 a.m., at which time he was thrown out for disorderly conduct. He then met a friend named "Hojamoto," who was driving Barbara's car. When defendant got into the vehicle to go "cruising," he noticed that Hojamoto was wearing a bloody shirt. Hojamoto told defendant that he had been in a gang fight. Defendant then switched seats with Hojamoto, who jumped from the vehicle during the high-speed chase with the police.

Police subsequently charged defendant with the murder of Barbara Doyle and other felonies. Prior to

trial, defendant waived his right to have a jury determine his guilt or innocence.

At trial, Barbara's estranged husband, David Doyle, testified that he and Barbara were drinking at the Garage Inn tavern until 2:15 a.m. The two left the bar and fell asleep in Barbara's car. When he woke up, David noticed that defendant was in the driver's seat, and it appeared to him that Barbara and defendant knew each other. Defendant drove to the Golden Flame restaurant, where he and Barbara went inside. David, meanwhile, walked home alone.

A waitress from the Golden Flame restaurant testified that she served coffee to Barbara and defendant around 3:15 a.m. Another witness testified that he saw defendant "tinkering" with Barbara's car in an alley approximately 25 minutes later.

James Bunker, who knew defendant socially, also testified on behalf of the State. Bunker told the court that he was at a party with defendant on the night before Barbara's murder. According to Bunker, defendant had taken a "Buck-type knife" from another person at the party. In court, Bunker identified the knife which police recovered from Barbara's car as the knife defendant had taken the night before. Bunker further testified that "Hojamoto" was a fictitious name commonly used by defendant and friends as a form of greeting. In fact, defendant had in the past referred to Bunker as "Hojamoto," and vice versa. When asked why the group used the name, Bunker responded, "[It was] just like a greeting, you know ***. How are you doing? Moto."

Defendant testified on his own behalf. In contrast to his original statement to the police, at trial defendant claimed that he had killed Barbara only after she drew a knife on him during a drug deal that had gone awry. Defendant explained to the court that he had been drinking alcohol and ingesting drugs throughout the

day. When he arrived at the Garage Inn tavern, he noticed Barbara, whom he had previously known, sitting at the bar with her husband. Barbara and her husband later left the tavern. Defendant, meanwhile, continued to drink until he was thrown out for disorderly behavior. He then approached Barbara's vehicle, and she asked him if he would like to smoke some marijuana. The two of them proceeded to get "high," and they later drove to the Golden Flame restaurant. Upon leaving the restaurant, they smoked more marijuana and stopped three times to purchase liquor. According to defendant, he had by that time consumed at least two cases of beer, drank some whiskey, smoked one ounce of marijuana, ingested 10 quaaludes, and injected Talwin.

Defendant further testified that he and Barbara stopped twice to engage in consensual sexual relations. Afterwards, Barbara asked defendant if he would sell her some marijuana. He agreed, and placed seven one-ounce bags of marijuana on the vehicle's console. After paying for one of the bags, Barbara attempted to steal two more. A struggle ensued, and she eventually brandished a knife and began attacking him. At some point in the struggle, defendant gained control of the knife and began stabbing Barbara, realizing what he was doing only after he saw that she was bleeding from her chest. He then removed Barbara's body from the car and sounded the car's horn (apparently in an attempt to summon help). He drove to a friend's house, but left when no one answered the door. Defendant next recalled being chased by the police, but could not remember anything else other than being taken into custody.

At the close of the evidence, the circuit court found defendant guilty of all charges. On the following day, the court ruled that defendant was eligible for the death penalty (720 ILCS 5/9—1(b)(6)(c) (West 1994) (commis-

sion of first degree murder in the course of another felony)) and that the evidence in mitigation did not outweigh the aggravating factors. Accordingly, the court imposed a sentence of death. This court affirmed that decision on direct appeal. *People v. Madej*, 106 Ill. 2d 201 (1985).

## ANALYSIS

The matter is now before this court on dismissal of defendant's amended petition for relief under the Post-Conviction Hearing Act (725 ILCS 5/122—1 *et seq.* (West 1992)). A post-conviction action is a collateral attack on a prior conviction and sentence. *People v. Mahaffey*, 165 Ill. 2d 445, 452 (1995). The scope of the proceeding is limited to constitutional matters which have not been, nor could have been, previously adjudicated. *People v. Whitehead*, 169 Ill. 2d 355, 370 (1996). Any issues which could have been raised on direct appeal, but were not, are waived (*People v. Ruiz*, 132 Ill. 2d 1, 9 (1989)) and any issues which have already been decided by a reviewing court are barred by the doctrine of *res judicata* (*People v. Silagy*, 116 Ill. 2d 357, 365 (1987)). In addition, a defendant is not entitled to an evidentiary hearing unless the allegations set forth in the petition, as supported by the trial record or accompanying affidavits, show that a constitutional right has been violated. *People v. Caballero*, 126 Ill. 2d 248, 259 (1989). In making that determination, all well-pleaded facts in the petition and affidavits are to be taken as true. *Caballero*, 126 Ill. 2d at 259. Upon review of a dismissal of a petition without an evidentiary hearing, the trial court's decision will not be disturbed absent an abuse of discretion. *People v. Whitehead*, 169 Ill. 2d 355, 370-71 (1996).

Ineffective Assistance of Counsel During Sentencing

A. *Failure to Present Mitigating Evidence*

Defendant first argues that he was denied effective

assistance of counsel during the aggravation/mitigation phase of the sentencing hearing due to his attorney's failure to investigate potential mitigating evidence prior to trial. According to defendant, counsel decided to forgo such an investigation under the mistaken belief that there would be sufficient time to prepare a mitigation defense if defendant were found guilty. Once the court reached its verdict, however, the State requested an immediate hearing on the death penalty in order to accommodate out-of-state members of the victim's family. Although the court denied the State's request for a hearing *instanter*, the court nevertheless scheduled the hearing for the following day. Defendant claims that such a short continuance, coupled with his attorney's lack of pretrial preparation, prejudiced his ability to put on an adequate mitigation defense. In support of this contention, defendant points out that his entire defense consisted of a brief statement to the court. In the statement, defendant merely noted that he had the opportunity to use drugs and alcohol while in jail, but had declined to do so. He further stated that if he were ever released from prison he would never use drugs or alcohol again. He also acknowledged that he had been using drugs since his teenage years, and that drugs "had the greatest part to do with the case." When counsel asked him whether there were "any events occurring in [his] life or ... in [his] home situation that may have been a contributing factor in [his] being heavily involved in drugs," and hence a contributing factor in Barbara's murder, defendant explained, "Well, it was hard to cope with my parents [because they] always did have something against the drugs." Defendant then expressed remorse for his crimes. No other evidence was offered in mitigation.

Defendant now argues that had his trial counsel undertaken a proper investigation prior to trial, he would

have discovered "a wealth of available mitigating evidence" which could have been presented to the trial court. That evidence, appended to defendant's amended petition for post-conviction relief, can be summarized as follows.

Defendant was born in Poland and came to the United States while still an infant. His parents, Helena and Kazamier Madej, were strict disciplinarians who physically punished their children's acts of disobedience. Helena Madej acknowledges that her husband would often beat defendant, and that her husband was a violent person with a drinking problem. Jill Miller, a forensic social worker who submitted a report on defendant's behalf, believes that "Kazamier Madej's chronic abuse of alcohol during [defendant's] childhood, and into his adult years, had a significant impact on the development of [his] personality, and on his behavior." She further maintains that defendant exhibits "many of the characteristics of adult children of alcoholics, including: low self-esteem; difficulty trusting others; difficulty establishing or maintaining intimate relationships; denial and repression of feelings; poor problem solving skills; impulsiveness; and increased incidence of alcohol or drug abuse." According to Miller, defendant continues to show "some of the characteristics of an adult chid [sic] of an alcoholic."

The evidence further shows that defendant began using drugs and alcohol during his early teenage years. He soon dropped out of high school and entered the military. Despite his continued use of drugs and alcohol while in the army, defendant eventually earned his GED certificate and was later honorably discharged. Upon returning to Chicago, defendant attended Triton College for two semesters before withdrawing due to his first arrest in November 1977. Defendant later obtained employment at an automobile service station. That

employment ended, however, following his second arrest in July 1978. Defendant spent the next seven months travelling around the country, eventually finding part-time work in California "doing odd jobs." He returned to Chicago in February 1979 and was soon arrested again. He remained in jail until October 1980. After his release, defendant worked for a short time at Methode Electronics. He was laid off in April 1981 due to a "phase down" of Methode's Chicago plant. He worked briefly for three more employers before his final arrest for the instant offense.

The petition further alleges that defendant suffers from both psychological and neurological impairments. Dr. James O'Donnell, an assistant professor of pharmacology, believes that defendant is a drug addict and an alcoholic whose "atrophy of brain tissue [has led] to an impairment in his neuropsychological function; in other words, his ability to think and reason." Dr. Linda Wetzel, the director of Neuropsychological Assessment at the West Side V.A. Hospital, also believes that defendant suffers from "mild to moderate" atrophy of the brain tissue. In her affidavit, she explains that defendant shows signs of attention deficit and impaired verbal learning ability, and that he has experienced headaches and depression during his incarceration. Dr. Dan L. Zimbroff, a board certified psychiatrist and neurologist, opines that defendant has been in need of psychiatric treatment since he was 14 years old. He further postulates that defendant was "physically and verbally abused by his sadistic and alcoholic father who show[ed] no signs at all of being a competent and empathic parent in any way."

Finally, defendant claims that he has had an excellent incarceration record. For example, he notes that he had been both compliant and responsible during his confinement at Cook County jail while awaiting trial for

the instant offense. During that time, he developed "some insight" into his behavior and recognized the negative effects of drugs and alcohol. In addition, he has, since his conviction for Barbara's murder, adjusted well to his incarceration at Menard State Penitentiary.

According to defendant, his attorney's failure to investigate his background and present the foregoing evidence "amounted in every respect to no representation at all." *Blake v. Kemp*, 758 F.2d 523, 534 (11th Cir. 1985). He describes his attorney's effort in this regard as a "mere sham," adding that counsel simply "[gave] up and abandon[ed] any attempt to present mitigating evidence." He concludes that his counsel was incompetent, and that as a result he was denied his constitutional right to effective assistance of counsel. U.S. Const., amends. VI, XIV; Ill. Const. 1970, art. I, § 8.

In response, the State points out that this court previously rejected defendant's claim of ineffective assistance of counsel based on his counsel's failure to present sufficient mitigating evidence. *People v. Madej*, 106 Ill. 2d 201 (1985). On direct appeal, this court held that defendant did not meet his burden of demonstrating a reasonable probability that the result of the sentencing hearing would have been different. *Madej*, 106 Ill. 2d at 215-16. The State insists, therefore, that the defendant is now barred from relitigating that issue under the doctrine of *res judicata. People v. Silagy*, 116 Ill. 2d 357, 365 (1987). We disagree.

As defendant points out, most of the evidence submitted in support of the amended petition for post-conviction relief did not appear in the original trial record and was not available to appellate counsel on direct appeal. For example, the affidavits of Drs. O'Donnell, Wetzel and Zimbroff, all of which offer expert opinions on defendant's psychological and neurological impairments, were presented for the first time in defendant's

amended petition for post-conviction relief. Thus, when the court held on direct appeal that defendant failed to demonstrate a reasonable probability that the result of the sentencing proceeding would have been different, it did so solely on the basis of the record as it then existed. The record now contains substantial mitigation evidence which, defendant claims, should have been presented at the original trial, but was not. Under these circumstances, we have repeatedly held that procedural fairness dictates that the rules of *res judicata* be relaxed, and that the merits of defendant's claim be considered. See *People v. Henderson*, 171 Ill. 2d 124, 150-51 (1996); *People v. Eddmonds*, 143 Ill. 2d 501, 528 (1991); *People v. Orange*, 168 Ill. 2d 138, 166-67 (1995); *People v. Thompkins*, 161 Ill. 2d 148, 166 (1994). Consequently, we decline to utilize the doctrine of *res judicata* to bar defendant's claim of ineffective assistance of counsel.

*Res judicata* notwithstanding, the State alternatively argues that defendant knowingly waived his right to present additional mitigating evidence when he told his counsel and the trial court that he did not want any other witnesses to testify on his behalf. The record here discloses that after defendant testified, the court asked defense counsel whether any other witnesses would be called to the stand. Counsel replied, "No, your Honor. I have been instructed by my client that he wishes to have no one else called in his defense ***." The court then asked defendant whether he wished to present any other witnesses or testimony "in any form." Defendant replied, "No, sir."

Relying on *People v. Emerson*, 122 Ill. 2d 411 (1987), the State maintains that defendant should not be allowed to complain of his counsel's failure to present additional mitigating evidence because defendant himself was the reason for the lack of the evidence in the first place. In *Emerson*, the defendant claimed that he was

denied effective assistance of counsel because his attorney did not present any evidence in mitigation. The court rejected that argument, in part, on the ground that Emerson had specifically instructed his attorney not to do so. Noting that "counsel's conduct at the sentencing hearing was consistent with the defendant's stated wishes," this court held that Emerson could no longer complain of his counsel's failure to present evidence at the sentencing hearing. *Emerson*, 122 Ill. 2d at 440.

We note, however, that during the pendency of this appeal, the federal courts granted Emerson's request for *habeas corpus* relief on the basis that his counsel's performance at sentencing was constitutionally deficient. *United States ex rel. Emerson v. Gramley*, 883 F. Supp. 225 (N.D. Ill. 1995), *aff'd*, 91 F.3d 898 (7th Cir. 1996). Contrary to the position taken by this court, the Seventh Circuit Court of Appeals held that "Emerson's waiver of his procedural rights at the sentencing hearing [could not] be considered a knowing waiver to which he should be held." *Emerson*, 91 F.3d at 906. The court reached this conclusion by noting that Emerson's counsel had not undertaken any investigation into the possible existence of mitigating evidence. Without such an investigation, the court stressed, defense counsel could not adequately advise Emerson on whether he should present evidence in mitigation. *Emerson*, 91 F.3d at 906. The Seventh Circuit further emphasized that neither counsel nor the trial court warned Emerson of "the fell consequences of failing to establish some mitigating circumstances without which (because the evidence of aggravating circumstances was overwhelming) a sentence of death was certain unless the jury disobeyed the judge's instructions." *Emerson*, 91 F.3d at 906. As a result, the decision to forgo the presentation of mitigating evidence could not be considered a "knowing"

waiver; therefore, Emerson was entitled to a new sentencing hearing.

In light of the recent developments in *Emerson*, defendant submits that he, too, could not have knowingly waived his right to present additional mitigating evidence. Defendant points out that his attorney, like Emerson's, did not conduct an investigation into possible sources of mitigation. He further states that the constitutional right to effective assistance of counsel would be meaningless if courts were to condone an attorney's failure to investigate and prepare for a capital sentencing hearing. We agree.

The record in the instant case reveals that although defendant understood the concept of mitigation, he was never advised of the considerable quantity of mitigating evidence available for presentation to the court, including the opinions of several expert witnesses who now believe that defendant suffers from various psychological and neurological impairments. The reason defendant was not informed of this evidence was because his attorney never conducted an investigation into possible sources of mitigation. Without such an investigation, defense counsel was not in a position to provide defendant with a realistic assessment of all available options. Thus, when defendant indicated to the trial court that he did not wish to present any other testimony at the sentencing hearing, he did so without a full appreciation of the nature and extent of the mitigating evidence that could be presented on his behalf. See *Emerson*, 91 F.3d 898. Indeed, that it is questionable whether defendant fully understood the potential consequences of his decision to forgo the presentation of additional mitigating evidence can be readily seen from the paucity of evidence that he did present. Defendant's entire mitigation defense consisted of his own statement to the court as well as a few answers to questions posed by counsel,

all of which now comprise approximately eight pages of transcript. Such meager testimony at a capital sentencing hearing can hardly be deemed the equivalent of a fully presented mitigation defense, one that is complete with the testimony of relatives, colleagues and psychological experts. In fact, defendant's brief, self-serving and at times rambling account of his drug usage, which in this case is tantamount to the presentation of no evidence at all, clearly demonstrates that defendant failed to appreciate the gravity of his decision to limit his mitigation defense. This failure is critical, for as this court stated in *People v. Perez*, 148 Ill. 2d 168, 194 (1992), "[m]itigating evidence is extremely important under the Illinois capital sentencing scheme." Accordingly, we reject the State's argument that defendant "knowingly" waived the right to present additional evidence at the sentencing hearing under the circumstances of this case.

Having found waiver inapplicable, we now turn to the merits of defendant's claim of ineffective assistance of counsel. The standard for determining whether a defendant has been deprived of his or her right to effective assistance of counsel at a capital sentencing hearing is governed by *Strickland v. Washington*, 466 U.S. 668, 80 L. Ed. 2d 674, 104 S. Ct. 2052 (1984). Under *Strickland*, a defendant must show that counsel's performance fell below an objective standard of reasonableness and that, absent the errors, the judge " 'would have concluded that the balance of aggravating and mitigating circumstances did not warrant death.' " *People v. Henderson*, 171 Ill. 2d 124, 144 (1996), quoting *Strickland*, 466 U.S. at 695, 80 L. Ed. 2d at 698, 104 S. Ct. at 2069. Applying this standard to the case at bar, we initially determine whether counsel's decision to forgo an investigation into defendant's background, including the possibility that defendant may have suffered from psychological and neurological impairments, was supported by reasonable professional judgment.

In *People v. Orange*, 168 Ill. 2d 138, 149 (1995), we held that an attorney "has only a duty to make reasonable investigations or to make a reasonable decision which makes particular investigations unnecessary, and the reasonableness of a decision to investigate is assessed applying a heavy measure of deference to counsel's judgment." *People v. Orange*, 168 Ill. 2d 138, 149 (1995), citing *People v. Harris*, 129 Ill. 2d 123, 158 (1989). We recognized in that case that an attorney's decision not to pursue an endless investigation into defendant's background could, under some circumstances, be deemed tactical. *Orange*, 168 Ill. 2d at 149. For instance, where the facts and circumstances do not reveal a sound basis for further inquiry into a particular area, an attorney's decision to limit the scope of the investigation will not be deemed ineffective representation. *Orange*, 168 Ill. 2d at 150, citing *People v. Holman*, 164 Ill. 2d 356, 371 (1995). On the other hand, " 'case law rejects the notion that a "strategic" decision can be reasonable when the attorney has failed to investigate his options and make a reasonable choice between them.' " *Baxter v. Thomas*, 45 F.3d 1501, 1514 (11th Cir. 1995), quoting *Horton v. Zant*, 941 F.2d 1449, 1462 (11th Cir. 1991). In other words, the decision not to investigate must be the product of an informed judgment. See generally *Orange*, 168 Ill. 2d at 149.

Our review of the record in the instant case reveals that counsel's decision to forgo an investigation was neither the product of an informed judgment nor a strategic decision reached after weighing all available options. Rather, as counsel explained in his affidavit, the sole reason he had not made an investigation prior to trial was because he "expected to get sufficient time to investigate, prepare and present mitigation" in the event defendant would be found guilty. He then had less than 24 hours to prepare his mitigation evidence after

the court found defendant guilty of all charges. Courts from other jurisdictions have, under similar circumstances, proclaimed that "[i]t should be beyond cavil that an attorney who fails altogether to make any preparations for the penalty phase of a capital murder trial deprives his client of reasonably effective assistance of counsel by any objective standard of reasonableness." *Blake v. Kemp*, 758 F.2d 523, 533 (11th Cir. 1985); see also *Blanco v. Singletary*, 943 F.2d 1477, 1501 (11th Cir. 1991); *Harris v. Dugger*, 874 F.2d 756, 763 (11th Cir. 1989). We agree with the *Blake* court and hold that counsel's failure in this case to conduct an investigation into potential sources of mitigation fell below the minimum level of competent representation. We emphasize, however, that our decision on this issue is limited solely to the unique facts of this case. We further caution that if a " 'decision not to mount an all-out investigation ... [is] supported by reasonable professional judgment,' it is not ineffective assistance of counsel." *Stewart v. Gramley*, 74 F.3d 132, 135 (7th Cir. 1996), quoting *Burger v. Kemp*, 483 U.S. 776, 794, 97 L. Ed. 2d 638, 657, 107 S. Ct. 3114, 3126 (1987).

We next determine whether defendant suffered any prejudice as a result of his attorney's failure to conduct an adequate investigation, and hence his failure to present a full mitigation defense. We note that defendant's amended post-conviction petition was ruled upon by the same judge who presided over the trial in this matter. He was also the same judge who sentenced defendant to death. After thoroughly reviewing all of the mitigation material submitted in support of the amended petition, the trial judge denied relief without an evidentiary hearing. The judge ruled that "there [were] no justifiable grounds upon which relief can be granted defendant." Having undertaken our own review of the record, we do not believe that the trial judge abused his discretion in this regard.

138

At the time of sentencing, defendant stood convicted of the brutal rape and murder of Barbara Doyle. Medical evidence presented at trial revealed the presence of semen in Barbara's vagina and rectum. The report of the post-mortem examination further indicated that defendant had stabbed and slashed Barbara 34 times over various parts of her body. Most of the more serious wounds were located on her head, face and chest. The medical examiner also found several abrasions at the bridge of her nose and on her chin. In addition to the rape, sodomy and repeated stabbing of the victim, the State also introduced defendant's criminal record into evidence. Defendant had been convicted of robbery, possession of a stolen motor vehicle, and two separate incidents of criminal trespass to a vehicle. Based on the foregoing evidence, the circuit court determined that the only appropriate sentence was death. As the court noted at the original sentencing hearing, "[t]he repeated acts of savagery perpetrated on the middle-aged woman requires a sentence to meet the severity of the crime against her. Any less, or term of years in the penitentiary[,] would encourage other criminals to repeat this kind of behavior on innocent victims in our society."

In contrast to the State's evidence, defendant, in his amended post-conviction petition, submitted expert testimony relating to his chronic use of drugs and alcohol. Defendant further sought to show the negative effects that such abuse had on his psychological and neurological health. However, this court, like others, has recognized that a history of substance abuse is a double-edged sword at the aggravation/mitigation phase of the penalty hearing. For example, in *People v. Shatner*, 174 Ill. 2d 133, 159 (1996), we stated that "[s]imply because the defendant views his drug abuse history as mitigating does not require the sentencer to do so." In *Shatner*, as in the instant case, defendant claimed that

the sentencing judge should have found that defendant's history of drug abuse was a factor relating to his criminal behavior. We rejected that argument on the following grounds:

"Underlying this premise is that since drugs are partly to blame for his actions, the defendant is somehow less culpable and should not suffer the ultimate penalty for his criminal behavior. Simply stated, the sentencing judge was under no legal obligation to subscribe to this suggestion. To the contrary, the sentencing judge was free to conclude, under the circumstances, that defendant's drug history simply had no mitigating value but was, in fact, aggravating." *Shatner*, 174 Ill. 2d at 160.

Consistent with our opinion in *Shatner*, we do not believe that the trial judge in this case was required to view the purported negative effects of defendant's chronic abuse of drugs and alcohol as a mitigating factor.

Furthermore, with respect to the impairment of defendant's neurological functions, this court has repeatedly held that "information about a defendant's mental or psychological impairments is not inherently mitigating." *People v. Tenner*, 175 Ill. 2d 372, 382 (1997), citing *People v. Sanchez*, 169 Ill. 2d 472, 491-92 (1996). As we explained in *Tenner*, "[a]t sentencing, a judge or jury considering evidence of this nature might view the information as either mitigating or aggravating, depending, of course, on whether the individual hearing the evidence finds that it evokes compassion or demonstrates possible future dangerousness." *Tenner*, 175 Ill. 2d at 382 (citing *People v. Foster*, 168 Ill. 2d 465, 491 (1995), *People v. Mahaffey*, 165 Ill. 2d 445, 467-68 (1995), and *People v. Jones*, 144 Ill. 2d 242, 272-73 (1991)). Even if we were to consider defendant's alleged psychological and neurological impairments as mitigating factors, "[m]itigation evidence of a defendant's cognitive abilities and mental health does not preclude imposition of a death sentence when that evidence is outweighed by ag-

gravating evidence." *People v. Pulliam,* 176 Ill. 2d 261, 286 (1997), citing *People v. Wilson,* 164 Ill. 2d 436, 460 (1994).

Similarly, the remainder of the evidence offered by defendant carries little, if any, weight in terms of mitigation. For example, defendant's employment history was erratic at best. We note that defendant never held a job for very long, often being fired as a result of his arrests for various crimes. As to defendant's somewhat troubled childhood, the trial court in this case was free to conclude "that it simply had no mitigating value but may have been, in fact, actually aggravating." *People v. Ward,* 154 Ill. 2d 272, 337 (1992). Moreover, "evidence that a defendant has been physically or sexually abused *** does not invalidate a death sentence when outweighed by aggravating evidence." *People. v. Pulliam,* 176 Ill. 2d at 286, citing *People v. Taylor,* 166 Ill. 2d 414 (1995). Finally, although defendant's good behavior during incarceration may be viewed as a mitigating circumstance, we do not consider that evidence sufficiently offsetting in light of the aggravating circumstances in this case.

In view of the foregoing, we hold that defendant has not shown a reasonable probability that the outcome of his sentencing hearing would have been different if his attorney had investigated and prepared more adequately for the aggravation/mitigation phase of the trial. Therefore, the trial court did not abuse its discretion in denying defendant's amended petition for postconviction relief on the grounds that defendant's attorney provided ineffective assistance of counsel at the sentencing hearing.

B. *Failure to Inform Defendant of Nonunanimity Rule*

Defendant next argues that his counsel was ineffective in failing to advise him, prior to waiving a jury for sentencing, that the jury's decision to impose the death

penalty had to be unanimous. This contention is similar to an argument defendant raised on direct appeal. There, defendant claimed that the trial court erred by accepting his waiver of the jury without first informing him of the "nonunanimity" rule, as it is sometimes referred to. We rejected that argument *in toto*, noting that this court had already "declined *** to adopt a requirement that trial courts must inform a defendant of the jury unanimity requirement before accepting jury waivers at capital sentencing hearings." *People v. Madej*, 106 Ill. 2d 201, 220 (1985), citing *People v. Albanese*, 104 Ill. 2d 504 (1984).

Now, in a slightly different argument, defendant maintains that his attorney, as opposed to the trial court, should have informed him of the nonunanimity rule. Defendant claims that his attorney's failure to do so constituted ineffective assistance of counsel. As the State correctly points out, however, this court rejected a similar contention in *People v. Ruiz*, 132 Ill. 2d 1 (1989). In that case, this court stated in pertinent part:

> "[W]e do not consider that trial counsel was ineffective for failing to advise the defendant of the nonunanimity rule, assuming that allegation to be true. The defendant knew of his right to have a jury during the sentencing phase of the proceedings, and the record reveals that he waived the right knowingly and voluntarily. The defendant does not allege that he would not have waived his right to a jury had he known of the nonunanimity rule." *Ruiz*, 132 Ill. 2d at 21.

Defendant attempts to circumvent the holding in *Ruiz* by focusing solely on the last sentence quoted above. Defendant here claims that, unlike the defendant in *Ruiz*, he would not have waived his right to be sentenced by a jury had his attorney informed him of the nonunanimity rule.

In our view, defendant places too much emphasis on the isolated comment in *Ruiz* concerning defendant's failure to allege that he would have waived a jury at

the sentencing hearing. The court's holding in *Ruiz*, that counsel was not ineffective for failing to inform his client that a jury had to reach a unanimous decision, was based primarily on this court's rejection of "a requirement that a defendant be expressly advised of the nonunanimity rule *** as a condition of a valid jury waiver at a capital sentencing hearing." *Ruiz*, 132 Ill. 2d at 20-21 (citing *People v. Erickson*, 117 Ill. 2d 271 (1987), and *People v. Madej*, 106 Ill. 2d 201 (1985)). The holding in *Ruiz* was not limited solely to defendants who failed to allege that they would have opted for a jury. Thus, the fact that defendant here claims he would have requested a jury had he known of the nonunanimity rule does not compel a different result from that of *Ruiz*. Therefore, we reject defendant's contention that he was denied effective assistance of counsel because his attorney failed to advise him that a sentencing jury had to reach a unanimous decision. *Ruiz*, 132 Ill. 2d at 21.

## C. *Error in Stipulating to Death Eligibility*

Defendant further claims that his counsel rendered ineffective representation at the sentencing hearing when counsel stipulated that defendant knew, at the time he killed Barbara, that his conduct created a strong probability of death. The record reflects that during the eligibility phase of the sentencing hearing, defense counsel specifically told the court that "[i]t is our position that [defendant] did not murder the individual intentionally as the act created—that he did create a strong probability of death, that was his testimony at trial." Defendant points out that, in order for him to be death eligible, the State had the burden of proving beyond a reasonable doubt that defendant acted either "intentionally or with the knowledge that the acts which caused the death created a strong probability of death or great bodily harm." See Ill. Rev. Stat. 1985, ch. 38, par. 9—1(b)(6)(b). Defendant now argues that his counsel

erred by conceding that defendant knew that his acts created a strong probability of death when in fact defendant had proceeded at trial under the theory of diminished mental capacity.

Initially, we reject this argument as being waived due to defendant's failure to raise the issue on direct appeal. See *People v. Ruiz*, 132 Ill. 2d 1, 9 (1989). Defendant, however, argues in his brief that his appellate counsel was ineffective for omitting this argument when the matter previously came before this court. Thus, we will address the merits of the claim in the context of ineffective assistance of appellate counsel. *People v. Foster*, 168 Ill. 2d 465, 474 (1995).

Because claims of ineffective appellate counsel are reviewed under the *Strickland* standard (see *People v. Coleman*, 168 Ill. 2d 509, 523 (1995)), we need not determine whether counsel's performance fell below an objective standard of reasonableness if defendant cannot show prejudice resulting from the actions of his counsel. *People v. Smith*, 176 Ill. 2d 217, 231 (1997) (noting that counsel's concession of death eligibility is subject to the analysis employed in *Strickland* rather than *United States v. Cronic*, 466 U.S. 648, 80 L. Ed. 2d 657, 104 S. Ct. 2039 (1984)). After reviewing the record in the instant case, we do not believe that defendant has made the requisite showing of prejudice to him caused by ineffective assistance of counsel. Significantly, the trial judge in this case did not base his findings of death eligibility on the basis of counsel's statement, but rather on the evidence presented at trial. The trial judge noted: "I believe that those factors [rendering defendant death eligible] have been clearly established in overwhelming nature by the State's evidence ***." From these comments, it is clear that defendant's contention that his eligibility hearing might have been different had his attorney not conceded his state of mind is doubtful at best.

Because counsel's purported concession to the court had little, if any, impact on the judgment in this case, defendant has not shown that he suffered any prejudice. "An error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment." *Strickland*, 466 U.S. at 691, 80 L. Ed. 2d at 696, 104 S. Ct. at 2066. Consequently, we do not find that defendant received ineffective assistance of counsel in this regard.

## Ineffective Assistance of Counsel at Trial

A. *Failure to Advise Defendant of Right Not to Testify*

We are next asked to consider whether defendant was denied effective assistance of counsel when his trial attorney told him that he had to testify during the guilt and innocence stage of the proceedings. According to defendant, counsel never explained to him that he had a right not to testify. See *Rock v. Arkansas*, 483 U.S. 44, 97 L. Ed. 2d 37, 107 S. Ct. 2704 (1987). Nor did counsel explain to him the implications of his decision to testify in his case in chief. See *United States v. Teague*, 953 F.2d 1525 (11th Cir. 1992). Instead, counsel merely told him that he "must testify *** but gave no reasons." As a result, "not only was he denied his constitutional rights, but his testimony provided the prosecution with the only eyewitness in an otherwise circumstantial case."

In response, the State offers three arguments to counter defendant's allegation that he had no input into counsel's decision to put him on the stand. First, the State argues that defendant testified voluntarily. In support of this argument, the State points out that defendant never told the trial judge that he did not want to testify, nor did he ever complain of coercion or threats. In addition, the State directs our attention to closing

arguments, where defense counsel specifically told the court, "We heard [defendant] testify, and he did so voluntarily and on his own accord ***." The State concludes that "[a]lthough defense counsel may have told defendant that he 'must' testify, this simply meant that it was in defendant's best interests to testify, given the evidence at hand."

Although facially appealing, we do not believe that we can, at this juncture in the litigation, decide this issue in the manner suggested by the State. As noted at the outset, the matter is before this court on dismissal of defendant's amended petition for post-conviction relief *without* an evidentiary hearing. Given this procedural posture of the case, all well-pleaded facts in the petition and affidavits are to be taken as true. *People v. Caballero*, 126 Ill. 2d 248, 259 (1989). Accordingly, we must accept as true defendant's averment that he played no part in counsel's decision to have him take the stand.

The State next responds that counsel's decision to have defendant testify can be viewed merely as trial strategy. According to the State, counsel knew that the evidence against defendant was overwhelming and that the only potentially successful defense was either (i) a claim of lack of intent due to the ingestion of drugs and alcohol or (ii) a claim of self-defense. In either case, defendant's testimony would be necessary since he was the only eyewitness to the crime. The State further asserts that defendant's attorney could later utilize that same testimony at sentencing in order to show that defendant lacked the requisite mental state for death eligibility. In the State's view, because the decision to have defendant testify constituted a matter of trial strategy, counsel cannot be deemed ineffective. We disagree with this argument for the following reasons.

A defendant's right to testify at trial is a fundamental constitutional right, as is his or her right to choose

not to testify. See *Rock v. Arkansas,* 483 U.S. 44, 97 L. Ed. 2d 37, 107 S. Ct. 2704 (1987). It is now generally recognized that the decision whether to testify ultimately rests with the defendant. *People v. Brocksmith,* 162 Ill. 2d 224, 227 (1994); *People v. Thompkins,* 161 Ill. 2d 148, 177 (1994). Therefore, it "is not one of those matters which is considered a strategic or tactical decision best left to trial counsel." *People v. Seaberg,* 262 Ill. App. 3d 79, 83 (1994), citing *Jones v. Barnes,* 463 U.S. 745, 751, 77 L. Ed. 2d 987, 993, 103 S. Ct. 3308, 3312 (1983); *People v. Wilson,* 146 Ill. App. 3d 567, 580 (1986), *rev'd in part on other grounds,* 121 Ill. 2d 585 (1988); *People v. Campbell,* 129 Ill. App. 3d 819, 821 (1984). See also *People v. Ramey,* 152 Ill. 2d 41, 54 (1992); *People v. Anderson,* 266 Ill. App. 3d 947, 956 (1994); *People v. Daniels,* 230 Ill. App. 3d 527, 535 (1992); *People v. von Perbandt,* 221 Ill. App. 3d 951, 954-55 (1991); *People v. Dredge,* 148 Ill. App. 3d 911, 913 (1986). Consequently, even though counsel's decision requiring defendant to testify in this case may be explained in terms of trial strategy, it cannot be justified on those grounds. Only the defendant may waive his right to testify. *Seaberg,* 262 Ill. App. 3d at 83; see also *Ramey,* 152 Ill. 2d at 54.

Finally, the State argues that even if we were to hold that counsel could not unilaterally require defendant to testify under the guise of trial strategy, defendant has still failed to satisfy the prejudice component of the *Strickland* analysis. We agree. We do not believe that the absence of defendant's testimony would create a reasonable probability that the outcome would have been different in light of the overwhelming evidence presented at trial. The voluminous and largely uncontroverted evidence revealed that defendant was driving the victim's car over 80 miles an hour as he led police officers on a high-speed chase. When the police finally apprehended defendant, he was covered with blood. The

murder weapon, which was later identified by a State's witness as the knife defendant had previously taken from a party, was found in the victim's car. The victim's bloody blouse and pants were also found in the car. Defendant's own explanation to the police as to how he came to be in the victim's car proved to be a sham. James Bunker, testifying that "Hojamoto" was a fictitious character, completely undermined defendant's fabricated explanation to the police, as did the testimony of several other witnesses who placed defendant with the victim prior to her death. The State aptly points out that "[e]very bit of this evidence, save for the impeachment evidence during defendant's cross-examination, would have been introduced, regardless of whether defendant testified, and, in fact, was introduced during the People's case-in-chief." Collectively, this evidence leads to the one, inescapable conclusion that defendant was the person who committed these crimes.

In view of the compelling nature of the foregoing evidence, defendant cannot demonstrate that he suffered prejudice from his attorney's alleged coercion to testify. As a result, the circuit court did not err in dismissing the claim of ineffective assistance of counsel on this ground. See *Strickland v. Washington*, 466 U.S. 668, 80 L. Ed. 2d 674, 104 S. Ct. 2052 (1984).

B. *Failure to Corroborate Diminished Capacity Defense*

Defendant next maintains that even if this court were to disagree with him concerning counsel's decision to have him testify, the record nevertheless demonstrates that his attorney provided ineffective representation throughout the remainder of the trial. For example, defendant contends that once "the decision was made to have [him] testify it was imperative that his testimony be corroborated and that independent lay and expert testimony supporting a defense of diminished capacity be presented." In support of this argument, de-

fendant suggests that his attorney should have questioned a second waitress from the Golden Flame restaurant, Jane Sparks, concerning a statement she made to the police. In the statement, Sparks indicated that defendant and the victim "appear[ed] to be high on something." Defendant further argues that his attorney erred by not having his brother and three acquaintances take the stand on defendant's behalf. According to defendant, these witnesses could have testified as to defendant's history of drug and alcohol abuse. Defendant also submits that his attorney should have called Dr. O'Donnell as an expert witness. Defendant believes that testimony from Dr. O'Donnell would have confirmed that Barbara had ingested either heroin, morphine or codeine shortly before her death. Finally, defendant points out that a police inventory sheet disclosed that a "bag containing crushed green plant" had been confiscated at the scene of the crime, but was later misplaced by the police. Defendant believes that his attorney should have offered the inventory sheet into evidence to corroborate his story that drugs did indeed play a part in Barbara's murder. According to defendant, his attorney's failure to present the foregoing corroborative evidence resulted in the denial of his constitutional right to effective assistance of counsel. We find this argument unpersuasive.

It is well established that decisions concerning which witnesses to call at trial and what evidence to present on defendant's behalf ultimately rest with trial counsel. *People v. Ramey*, 152 Ill. 2d 41, 53-55 (1992). Such decisions have long been viewed as matters of trial strategy (*People v. Haywood*, 82 Ill. 2d 540, 543-44 (1980)), which are generally immune from claims of ineffective assistance of counsel (*People v. Guest*, 166 Ill. 2d 381, 394 (1995); see also *People v. Gosier*, 165 Ill. 2d 16, 22 (1995) (noting that strategic choices are virtually unchallenge-

able); *People v. Palmer*, 162 Ill. 2d 465, 476 (1994) (same)). This general rule is predicated upon our recognition that the right to effective assistance of counsel refers to "competent, not perfect representation." *People v. Stewart*, 104 Ill. 2d 463, 492 (1984). Hence, " '[m]istakes in trial strategy or tactics or in judgment do not of themselves render the representation incompetent.' " *People v. Hillenbrand*, 121 Ill. 2d 537, 548 (1988). The only exception to this rule is when counsel's chosen trial strategy is so unsound that "counsel entirely fails to conduct any meaningful adversarial testing." *Guest*, 166 Ill. 2d at 394, citing *People v. Hattery*, 109 Ill. 2d 449, 464 (1985), citing *United States v. Cronic*, 466 U.S. 648, 656, 80 L. Ed. 2d 657, 666, 104 S. Ct. 2039, 2045 (1984). In our view, the above principles have particular resonance when applied to the case at bar.

Contrary to defendant's position, our review of the record reveals that counsel's trial strategy cannot be viewed as so unsound as to lead us to believe that he did not fulfill his obligation to provide a meaningful adversarial testing of the State's case. In fact, defendant's attorney presented ample evidence in support of his theory that defendant suffered from a diminished mental capacity. James Bunker testified that he and defendant began drinking beer at approximately 9 o'clock on the morning in question. He and defendant then went to a party at a local forest preserve, where they continued to drink alcohol until early afternoon. The two men eventually drove to a friend's house later in the afternoon to have a few more beers. When asked by defense counsel whether defendant was intoxicated, Bunker replied, "Yes, more or less. He had a few." Defense counsel later utilized Bunker's testimony during closing arguments when he reminded the court that defendant had "starting drinking—starting doing drugs as early as about 9:00 o'clock that Saturday morning."

The record also contains the testimony of Jacque Garceau, the bartender at the Garage Inn tavern, and George Moraitis, one of its patrons. Although both of these witnesses testified on behalf of the State, defense counsel did, during cross-examination, elicit evidence which was highly relevant to defendant's diminished capacity defense. Garceau, for example, acknowledged that at one point in the evening defendant had fallen asleep on his bar stool while drinking. Moraitis, meanwhile, agreed with defense counsel that defendant appeared to be high "on some kind of drug or whatever." In fact, Moraitis described defendant as a "maniac":

> "Well, the defendant was—he was walking around, was very hypersensitive, spaced out or something, and he was going by the telephone and was trying to call somebody up and he put the telephone back up there, up on the dial, on the hook and he was infuriated or something. He started shaking the telephone off the wall. He was very hypersensitive, he was very—like a maniac. It is unbelievable."

Thus, the record amply demonstrates that counsel, in furtherance of his theory of diminished capacity, elicited testimony from witnesses who directly observed defendant's drinking and behavior during the immediate hours preceding Barbara's murder.

In contrast to this evidence, defendant now insists that his attorney should have questioned another waitress from the Golden Flame restaurant concerning her statement to police, *i.e.*, that defendant and Barbara "appeared" to be "high." However, even if this witness had been called to the stand, and further assuming that she testified consistent with her prior out-of-court statement, her testimony would have been merely cumulative of the in-court testimony offered by Bunker, Garceau and Moraitis. Moreover, the statement itself is equivocal on its face because it, at most, indicates that defendant and the victim *"appeared"* to be high.

Consequently, counsel's decision not to question the waitress about her prior statement to the police can hardly be viewed as a grave error in trial strategy.

Similarly, having defendant's brother and his three friends take the stand would not, in our view, have made a significant impact on the diminished-capacity defense. Their testimony, the substance of which has been presented to this court pursuant to an offer of proof, pertains only to defendant's use of drugs and alcohol on other occasions. Notably, none of these witnesses were with defendant during the critical hours leading up to Barbara's murder. As a result, they could not have testified as to defendant's drug and alcohol consumption at that time. As noted above, Bunker, Garceau and Moraitis all observed defendant on the day in question. Their testimony, therefore, was far more probative on the issue of whether defendant's mental capacity was diminished at the time he killed Barbara than was the testimony of defendant's brother and his friends.

As to defendant's assertion that his attorney erred by not presenting any expert witnesses, we seriously doubt whether Dr. O'Donnell's proffered testimony would have had an impact on the outcome of this case. First, any testimony regarding Barbara's consumption of drugs and alcohol would have had little, if any, relevance in determining whether defendant himself suffered from a diminished mental capacity. Second, even if Dr. O'Donnell had been called as a witness, his testimony would have been limited to the findings presented in the toxicologist's report. Although that report itself has not been made a part of the record for this appeal, it was admitted into evidence by way of stipulation. The record reflects that the report included a specific finding of 14.6 micrograms per millimeter of morphine in Barbara's bile. Consequently, defense counsel had no reason to call Dr. O'Donnell. Indeed, the

toxicology report itself already corroborated defendant's claim regarding Barbara's consumption of drugs and alcohol. Finally, we consider any alleged error on counsel's part for failing to introduce the police inventory sheet referring to a "bag containing crushed green plant" barred by the doctrine of *res judicata*, that issue having been previously litigated on direct appeal. See *Madej*, 106 Ill. 2d at 214.

For the foregoing reasons, we reject defendant's contention that his attorney rendered ineffective assistance of counsel by failing to present additional evidence supporting his claim of diminished mental capacity.

### C. *Failure to Obtain Timely Ruling on Motion to Suppress*

In a completely different vein, defendant faults his lawyer for failing to obtain a ruling on a motion to suppress his custodial statements prior to having him take the stand at trial. In order to fully evaluate this claim, we must set forth some additional background facts. Shortly before trial, defendant's attorney filed a combined motion to suppress and motion to quash arrest. In the motion, defendant sought to exclude certain tangible evidence recovered by the police. That motion, however, was never ruled on prior to the commencement of the trial. During the trial, defendant took the stand on his own behalf and testified as to the events leading up to his arrest. Specifically, defendant stated that he had killed Barbara only after she attempted to steal his drugs. This in-court testimony differed significantly from defendant's original statement to the police, in which defendant tried to shift responsibility for the crimes to his friend "Hojamoto." Defendant further testified that certain police officers had beaten him during questioning. At that point, the circuit court converted the trial into a hearing on the combined motion to suppress and

motion to quash arrest. After hearing further testimony, the court denied the motion and resumed the trial.

Defendant now asserts that his trial counsel should have obtained a ruling on the motion to suppress prior to advising defendant to testify in his case in chief. By failing to do so, defendant argues, the State was later able to impeach defendant's trial testimony with his prior inconsistent statements to the police. Defendant suggests that there are only two possible explanations as to why counsel failed in this regard: (i) counsel did not know the substance of defendant's in-custody statements, or (ii) counsel did not consider their impeachment value very important. Defendant submits that, regardless of which of the two explanations this court accepts, his attorney rendered ineffective assistance of counsel. Alternatively, defendant contends that, when counsel finally did argue the motion to suppress, he did so ineffectively because he failed to seek suppression of defendant's "Hojamoto" statement on the ground that defendant was mistreated while in police custody. Specifically, defendant argues that his attorney erred by not presenting pathological evidence to corroborate his claim that police officers struck him in the head with a flashlight during his interrogation.

Initially, we note that defendant never sought the suppression of any statements he made while in custody, nor did he raise such a challenge on direct appeal. Therefore, the issue is waived. See *Ruiz*, 132 Ill. 2d at 9. Even so, because defendant also challenges the effectiveness of his appellate counsel for not preserving the issue, we will proceed to the merits of his claim. See *People v. Foster*, 168 Ill. 2d 465, 474 (1995).

Contrary to defendant's contention, we agree with the State that counsel's decision not to seek a ruling on the motion to suppress prior to calling defendant to the stand does not rise to the level of ineffective assistance

of counsel because defendant cannot satisfy *Strickland*'s prejudice requirement. As previously noted, defendant's motion to suppress did not seek the suppression of inculpatory statements made by defendant, but instead sought only to suppress certain tangible evidence.[1] Because defendant's in-custody statements were not the subject of the motion, a ruling in favor of the defendant would not have made a difference with respect to the State's ability to impeach him with his prior inconsistent statements. Furthermore, even if counsel had sought to suppress defendant's statements in the motion, the motion itself was patently without merit. During the hearing on the motion, defendant claimed that police physically abused him while he was in custody. Specifically, defendant accused Detective James Grant of hitting him on the head with a flashlight. On cross-examination, however, defendant admitted that he had received a head wound at a party approximately one week prior to killing Barbara. In addition, defendant's accusations of police mistreatment were also discredited by the testimony of the interrogating officers. For example, Detective Grant, who testified at the suppression hearing, was specifically asked whether "on August 23, 1981, when you were in the interview room with the Defendant, either with Detective Dolan or by yourself, did you physically abuse the Defendant in any way?" Detective Grant answered, "No, Sir." The State further asked Detective Grant whether he had struck defendant in any manner, either with or without a flashlight, on

---

[1]In his amended petition for post-conviction relief, defendant states, "Defense counsel requested leave to file a motion to suppress *statements*." (Emphasis added.) This, however, is not an accurate representation of the record. The motion reads in pertinent part: "NOW COMES the Defendant and respectfully moves this Honorable Court to suppress as evidence herein, certain property seized in violation of Article II, Sections 6 and 10 of the Constitution of the State of Illinois ***."

any part of his body, including his head. Detective Grant again replied, "No, Sir."[2]

Based on this evidence, the court concluded that defendant presented no "believable" or "credible" evidence in support of his motion to suppress. Consequently, the court denied the motion on its merits, a decision which we believe was not against the manifest weight of the evidence. Under these circumstances, defendant could not have suffered any prejudice as a result of his attorney's failure to obtain an early ruling on the motion to suppress. That motion, which did not even seek to suppress defendant's statements, was destined to be denied.

In a related argument, defendant maintains that his trial attorney should have cited a "significant line of authority [which] holds that in determining whether a statement was voluntarily made it is improper for a trial court to disregard a defendant's uncontroverted testimony." See *People v. Rhoads*, 73 Ill. App. 3d 288, 309 (1979); *People v. Peck*, 18 Ill. App. 3d 112, 116 (1974); *Haynes v. Washington*, 373 U.S. 503, 10 L. Ed. 2d 513, 83 S. Ct. 1336 (1963). Defendant points out that (i) he testified during the suppression hearing that police denied his requests for food, medical attention, a visit and a telephone call, and (ii) the State never rebutted this testimony. Defendant submits that his attorney's failure to cite the aforementioned legal authority in connection with his uncontroverted testimony resulted in the denial of effective assistance of counsel. We find this argument unpersuasive for two reasons.

First, even if we were to agree with defendant that the trial court in this case could not disregard his testimony, there is nothing in the record to suggest that

---

[2]Detective Dolan corroborated Detective Grant's testimony. He also testified that he neither struck nor physically abused defendant in any way.

the alleged denial of defendant's request for food and medical attention had anything to do with defendant's decision to speak with the police. In fact, defendant's "Hojamoto" statement appears to be a *deliberate* attempt on the part of the defendant to steer the police in the direction of another suspect. Second, even if the "Hojamoto" statement had been suppressed, it would not have changed the outcome in this case in light of the overwhelming evidence presented at trial. Hence, defendant cannot show prejudice. See *Strickland v. Washington*, 466 U.S. 668, 80 L. Ed. 2d 674, 104 S. Ct. 2052 (1984).

### D. *Failure to Introduce 911 Tape Recording*

Defendant next contends that his trial counsel erred by not presenting as a defense the possibility that another person may have been involved in the crimes. In support of this contention, defendant relies upon a 911 tape recording which contains the conversation between the police officers who pursued defendant and the police dispatcher who coordinated the pursuit. That recording purportedly referred to "two male white suspects in the car." Defendant believes that the "[i]ntroduction of the 911 tapes would have raised a reasonable doubt about whether [he] was guilty of all or some of [his] crimes."

Due to defendant's failure to raise this argument either on direct appeal or in his amended petition for post-conviction relief, this argument is waived. *People v. Johnson*, 154 Ill. 2d 227, 233 (1993), citing *People v. Flores*, 153 Ill. 2d 264 (1992). We further find no reason to excuse defendant's waiver under the exception for plain error. See generally *People v. Carlson*, 79 Ill. 2d 564, 576 (1980).

### E. *Cumulative Error*

Finally, defendant argues that his trial attorney committed a plethora of errors due to his inexperience

in trying criminal matters. According to defendant, these errors include "attempts to learn the basic facts of the case from the State's witnesses, ineffective cross-examination, ignorance of the adverse witness rule, ignorance on how to impeach a witness with a prior conviction, and attempts to elicit testimony, sometimes successful, that were harmful to the defense." Defendant submits that commission of the errors, cumulatively, resulted in a denial of his right to effective assistance of counsel throughout the trial proceedings. We disagree.

After undertaking a thorough review of each of these errors, both individually and collectively, we conclude that defendant's contention regarding ineffective assistance of counsel is without merit. In fact, we find nothing in the record to support defendant's claim that the alleged errors in this case were the product of an inexperienced trial counsel. We are mindful of the fact that "[j]udicial scrutiny of counsel's performance must be highly deferential" and that " '[a] fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time.' " *Guest*, 166 Ill. 2d at 393, quoting *Strickland*, 466 U.S. at 689, 80 L. Ed. 2d at 694-95, 104 S. Ct. at 2065. Having eliminated the distortion of hindsight in this case, we conclude that defendant has failed to demonstrate that his counsel's performance fell below an objective standard of reasonableness on the basis of the foregoing trial errors.

### Ineffective Assistance of Counsel on Appeal

In addition to challenging the preceding errors, all of which concern counsel's performance at trial, defendant also challenges numerous errors allegedly committed by his appellate counsel. We shall, however, limit

our present discussion to only those errors which are adequately supported by citation to the record and applicable legal precedent.

### A. *State's Failure to Preserve Exculpatory/ Mitigating Evidence*

Defendant maintains that his appellate counsel should have argued, on direct appeal, that defendant was denied due process of law as a result of the State's failure to preserve two pieces of evidence: (i) a prescription pill bottle bearing Barbara's name, and (ii) a bag containing "crushed green plant." Defendant's arguments concerning the bag of green plant were previously rejected by this court on direct appeal and, therefore, are barred by the doctrine of *res judicata*. See *Madej*, 106 Ill. 2d at 214. With respect to the pill bottle, the record shows that although several of the investigating officers had noticed a small plastic bottle on the front seat of Barbara's car, they never included the bottle in the police inventory. Defendant claims that had the police properly inventoried the bottle, his counsel could have offered the bottle into evidence and substantiated his claim that he and Barbara were intoxicated at the time of the murder. We disagree.

First, the record already contained substantial evidence of Barbara's intoxication at the time of her death, not the least of which was the toxicologist's report showing significant amounts of morphine in Barbara's bile. Introduction of the pill bottle, therefore, would have only provided an explanation as to the source of Barbara's intoxication, a fact which was already accepted by the trial court. Second, introduction of the pill bottle would not have substantiated defendant's claim of his own diminished capacity. Despite the fact that defendant himself took the stand, he never testified that he had ingested any of the drugs purportedly contained in the bottle. Thus, even if the State had preserved the

pill bottle, its introduction into evidence would not have changed the outcome in this case.

## B. *Trial Court's Consideration of Matters Dehors the Record*

The next argument for our consideration centers around certain comments made by the trial judge during the hearing on the motion to suppress. The record in this case reveals that, after reviewing photographs of defendant's head, the trial judge remarked that defendant's wound did not appear consistent with his claim of being struck by a flashlight. Specifically, the trial judge stated that "a flashlight would normally leave a bruise, not a scratch." The court also referred to the fact that defendant's wound was "heavily laden with scab formation showing an old wound," thereby giving credence to the State's theory that defendant's wound was inflicted prior to his incarceration. Defendant believes that the trial court, in making those comments, impermissibly relied on matters "outside the record." See *People v. White*, 183 Ill. App. 3d 838, 841 (1989) (holding that the "ability to examine a cut and determine the instrument that made it is beyond the province of common knowledge").[3] Defendant further concludes that his appellate counsel erred in not raising this argument on appeal. Again, we disagree.

The sixth amendment right to effective assistance of counsel does not mandate that appellate counsel " 'raise every conceivable argument which might be made, and counsel's assessment of what to raise and argue will not be questioned unless it can be said that his judgment in this regard was patently erroneous.' " *Coleman*, 168 Ill. 2d at 523, quoting *People v. Collins*, 153 Ill. 2d 130, 140

---

[3]Attached to defendant's amended petition for post-conviction relief is an affidavit from a pathologist who contradicts the trial court's conclusion regarding defendant's head wound.

(1992). In this case, appellate counsel's decision not to raise an argument with respect to the trial judge's speculation about defendant's wound was not patently erroneous. As we have pointed out elsewhere in this opinion, the evidence adduced at the suppression hearing strongly supported the trial court's denial of defendant's motion to suppress. Throughout this post-conviction proceeding, defendant has repeatedly focused solely on his own self-serving testimony of what transpired during the police interrogation. Defendant, however, overlooks the fact that his credibility was severely assailed by the State during cross-examination. For example, after claiming that he had received a head wound at the hands of the police, defendant acknowledged being hit in the head with a bottle a few days earlier. In addition, defendant originally told the court that the wound caused by the bottle was so inconsequential that he never sought any medical attention. Under the pressure of cross-examination, however, defendant changed his story, admitting that he had in fact gone to a local hospital. Needless to say, "[i]nconsistencies in defendant's testimony reflect adversely upon his credibility." *People v. West*, 137 Ill. 2d 558, 583 (1990).[4]

It is, of course, "the function of the trial judge to determine the credibility of the witnesses at a suppression hearing and to resolve any conflicts in their testimony." *People v. Garcia*, 165 Ill. 2d 409, 422 (1995). We simply will not usurp the trial judge's role in this case and ignore his express finding that defendant presented no "believable" or "credible" evidence in support of his motion to suppress. Because we do not believe that the outcome of the suppression hearing would have been different had the trial judge not speculated upon

---

[4]In contrast to defendant's testimony, which can be viewed as untrustworthy, both Officer Grant and Officer Dolan unequivocally denied abusing defendant in any way.

the age or origin of defendant's head wound, we reject defendant's claims of ineffective appellate representation.

In two related arguments, defendant accuses the trial court of engaging in improper speculation when it (i) "determined that the blemishes on the decedent's body shown in the autopsy photographs were caused by decedent being run over by a tire" and (ii) "determined in the absence of expert testimony that [defendant] could not have consumed the amount of alcohol and drugs he testified to having consumed on the date of the incident and to have engaged in a high speed chase with the police, jumped over a fence, and hid under a car." This latter argument was rejected on direct appeal (*Madej*, 106 Ill. 2d at 216-17); further argument, therefore, is barred by the doctrine of *res judicata* (*People v. Silagy*, 116 Ill. 2d 357, 365 (1987)). As for the autopsy photographs, we agree with the State that the trial court never stated that it believed that defendant had run over Barbara's body. Rather, the trial court merely asked counsel if he could explain why there were "gray and black and blue markings" on the victim's legs. We find no error in the trial court's asking this question.

### C. *Misstatement of the Evidence*

Defendant next challenges a statement made by the prosecutor regarding a tear in the victim's pants. During closing arguments, the prosecutor stated the victim's jeans were "torn." Defendant claims that the pants were cut, not "torn." We note, however, that "prosecutors are afforded wide latitude in closing argument and improper remarks will not merit reversal unless they result in substantial prejudice to the accused." *People v. Redd*, 173 Ill. 2d 1, 30 (1996). We fail to see how the prosecutor's characterization of the victim's pants constitutes reversible error in this case.

### D. *Errors During Sentencing*

Defendant further argues that the State had an obligation to inform the trial court of the fact that the State had offered defendant an 80-year prison term in exchange for a guilty plea. Defendant suggests that such an offer constitutes mitigating evidence. Defendant has cited no legal authority for this proposition; therefore, the argument is waived. 155 Ill. 2d R. 341; *People v. Felella*, 131 Ill. 2d 525, 540 (1989).

Defendant also contends that the defendant's lack of any significant criminal history is a mitigating factor which precludes the imposition of the death penalty as a matter of law. We previously rejected this argument on direct appeal (*Madej*, 106 Ill. 2d at 221); therefore, the argument is barred (*People v. Silagy*, 116 Ill. 2d 357, 365 (1987)).

### Miscellaneous Arguments

### A. *Reduction in Sentence*

Based upon the mitigating evidence presented in the amended petition for post-conviction relief, defendant requests this court to reduce his sentence to a term of years. We decline to do so. The determination of the propriety of a death sentence in any particular case " 'requires consideration of the character and record of the individual offender and the circumstances of the particular offense.' " *People v. Pasch*, 152 Ill. 2d 133, 201 (1992), quoting *Woodson v. North Carolina*, 428 U.S. 280, 304, 49 L. Ed. 2d 944, 961, 96 S. Ct. 2978, 2991 (1976). Accordingly, although we will conduct a thorough evaluation of the record when reviewing a sentence of death, we will not lightly overturn the trier of fact's findings where those findings are amply supported by the record. *People v. Pasch*, 152 Ill. 2d at 201; *People v. Odle*, 128 Ill. 2d 111, 130-32 (1988). See also *People v. Walker*, 109 Ill. 2d 484, 506 (1985) (holding that supreme

court's limited authority upon review does not permit reversal where "there is no indication that the [sentencer] imposed the penalty on other than a reasoned basis"). In our view, the record in the case at bar demonstrates that the trial court properly afforded defendant an individualized assessment of all relevant circumstances, and further did not act out of caprice or compassion in imposing the sentence of death. As noted elsewhere in the opinion, the evidence in aggravation was ample despite the mitigation now submitted by defendant. In sum, we do not believe that the trial court abused its discretion in this regard. See *People v. Montgomery*, 112 Ill. 2d 517, 533 (1986) (holding death penalty appropriate even where mitigating evidence consisted of a troubled youth, an alcoholic mother, an abusive and drug-addicted father, heavy drinking and an extreme mental or emotional disturbance).

B. *Failure to Grant Motion Seeking Substitution of Judge*

Defendant next maintains that the trial court erred in not granting his motion for substitution of judge or, alternatively, in not transferring the motion to another judge for ruling. Defendant claims that the trial judge, who at one point admonished defense counsel not to use the already delayed post-conviction proceedings as a further "delay tactic to stop the imposition of what the Illinois Supreme Court has said was a fair trial, a fair verdict, a fair death sentence after a fair death hearing," had prejudged the merits of defendant's amended petition for post-conviction relief. We disagree. It is well settled that "[t]here is no absolute right to a substitution of judge at a post-conviction proceeding." *People v. Hall*, 157 Ill. 2d 324, 331 (1993), citing *People v. House*, 202 Ill. App. 3d 893, 910 (1990), citing *People v. Wilson*, 37 Ill. 2d 617 (1967). "Rather, the same judge who presided over the defendant's trial should hear his post-

conviction petition, unless it is shown that the defendant would be substantially prejudiced." *Hall*, 157 Ill. 2d at 331 (citing *People v. Mamolella*, 42 Ill. 2d 69, 73 (1969), *People v. Neal*, 123 Ill. App. 3d 148, 152 (1984), and *People v. Day*, 152 Ill. App. 3d 416, 421 (1987)).

The record here discloses that defendant filed his *pro se* petition for post-conviction relief on April 9, 1986. The matter, which was originally assigned to another judge, was continued for various reasons over the course of the next five years. During that time, post-conviction counsel repeatedly represented to the court that an amended petition would be filed. Eventually, the matter was reassigned to the current judge. Although counsel again reassured the court that an amended petition would be forthcoming, nearly two more years passed before the amendment was actually filed. Consequently, when the trial judge warned counsel not to further prolong the proceedings, the trial judge was not prejudging the merits of defendant's amended petition for post-conviction relief, as defendant suggests. Rather, the trial judge was merely expressing his understandable frustration with the progress of the case. Furthermore, we have carefully reviewed the transcript in this respect, and can find no evidence of any bias on the part of the circuit court in this matter. Under these circumstances, we simply do not believe that the trial judge abused his discretion in denying defendant's motion for substitution of judge.

### C. *Failure to Grant Request for Discovery*

Defendant also argues that the trial court erred in denying his request for discovery during the pendency of the post-conviction proceedings. We note, however, that defendant fails to specify, in his brief, the nature of the alleged error. Consequently, we are unable to review this claim.

### D. *Constitutionality of Death Penalty Statute*

As a final matter, defendant raises seven separate challenges to the constitutionality of the Illinois death penalty statute. We have repeatedly rejected the same contentions in past decisions, and defendant provides no new grounds which would warrant a different result in this case. Defendant's first argument, that various aspects of the death penalty statute invite an arbitrary and capricious imposition of the sentence, was recently rejected in *People v. Burgess*, 176 Ill. 2d 289, 323 (1997). This court has also held that the statute is not invalid due to the fact that it fails to provide adequate pretrial notice of the State's intention to seek the death penalty. *People v. Silagy*, 101 Ill. 2d 147, 161-62 (1984). Nor is our death penalty statute unconstitutional for imposing a burden on defendant to establish that some other penalty should be imposed (*People v. Fields,* 135 Ill. 2d 18, 76 (1990)), or for not requiring the sentencer to issue a written memorial of its findings (*People v. Stewart*, 104 Ill. 2d 463, 499 (1984)). We further reject defendant's contention that the statute improperly gives unequal consideration of aggravating and mitigating factors (see *People v. Burgess*, 176 Ill. 2d at 322), and that it improperly fails to limit the nonstatutory aggravating factors which the sentencer may consider (*People v. Collins*, 106 Ill. 2d 237, 285 (1985)). Finally, we have never considered our death penalty statute unconstitutional for excluding any sympathies that may exist as mitigating evidence. *People v. Phillips*, 127 Ill. 2d 499, 543 (1989).

### CONCLUSION

For the reasons stated above, the judgment of the circuit court of Cook County is affirmed. The clerk of this court is directed to enter an order setting Tuesday, November 11, 1997, as the date on which the sentence is to be carried out. Defendant shall be executed in the

manner provided by law. 725 ILCS 5/119—5 (West 1994). The clerk of this court shall send a certified copy of the mandate in this case to the Director of Corrections, to the warden of Stateville Correctional Center, and to the warden of the institution where defendant is confined.

*Affirmed.*